IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


UNITED STATES OF AMERICA     )
                                   )     1:16CR205-2
    v.                        )     1:16CR205-3
                                   )     1:16CR205-4
SHANNON MICHELLE DRAKE     )
RONALD KEITH EARNEST       )
ROBERT THOMAS TAYLOR      )


**MEMORANDUM OPINION AND ORDER**

**OSTEEN, JR., District Judge**

Defendant Ronald Earnest ("Earnest") has filed several related pretrial motions, including a Motion to Preclude the Disclosure of Privileged Materials to the Government, (Doc. 98), a Motion for Discovery on the Disclosure of Information to the Government and Requests for Disclosure, (Doc. 101), a Motion to Compel Legal File from Defendant's Prior Attorneys, (Doc. 106), a Motion for Ex Parte Hearing, (Doc. 115), a Motion for Government to Return all Privileged Documents, (Doc. 120), as supplemented, (Doc. 138),[1] and a Motion to Allow Mr. Earnest to Review SML File prior to Disclosure to the Government, (Doc.

---

[1] Although the parties in this case have sealed their motions and supporting briefs, the court does not find it necessary to seal this Memorandum Opinion and Order. Although this court references Grand Jury testimony in passing, said references were addressed in open court at the motions hearing.

199). Defendant Shannon Drake ("Drake") joined in several of Earnest's motions, however, these issues as to Drake will be addressed by a separate, forthcoming order. In summary, it is not disputed that during the course of an investigation by the United States beginning in 2012, GrandSouth Bank ("the Bank") engaged Jim Medford and Smith Moore Leatherwood, LLP ("Smith Moore") to represent the Bank in that investigation. At that time, Earnest was President of the Bank and Drake was an employee of the Bank. It is also undisputed that the Bank was subpoenaed to appear and produce records to a Grand Jury in the Middle District of North Carolina as part of that investigation.

These motions are premised upon Earnest's allegation that during the course of the Government's investigation, an attorney-client relationship existed between himself and Smith Moore, that the attorney-client privilege attached to many documents produced during the course of this representation, and disclosure of these documents by counsel for the Bank to the Government was and is a violation of that privilege unless and until Earnest waives that privilege.

The United States contends no such attorney-client relationship or privilege existed between Earnest and Smith Moore, and further that it is free to seek records from the Bank

and its past and present attorneys as the Bank is the holder of any attorney-client privilege.

On November 9, 2017, a hearing was held during which the parties presented evidence as to whether there was an attorney-client relationship between Earnest and Smith Moore and/or between Drake and Smith Moore and, if so, what documents may be privileged. (Tr. of Nov. 9, 2017 Hr'g (Doc. 135) at 19-20.) Present at that hearing were the parties and their counsel; Jon Berkelhammer on behalf of Smith Moore; and Dan Boyce, Mark Moore, and Andrew Mathias on behalf of the Bank. This court overruled Smith Moore's objection as to attorney-client privilege in part and permitted the testimony of current and former Smith Moore attorneys. (Id. at 46-47.) This testimony was subject to such specific objections raised by counsel during the hearing. (Id.) This court did not issue a final ruling regarding the objection as to the production of documents. (Id. at 224.) Both counsel for Smith Moore and the Bank were permitted to participate during the hearing for the purpose of lodging any objections to specific questions propounded by the parties. (Id. at 46-47.)

Defendant Earnest called as witnesses Bruce Ashley, Laura Dildine, and Stephen Petersen, all of whom were attorneys at Smith Moore during the relevant time period. (Id. at 53, 107,

171-72.) The hearing was continued to February 8, 2018, at which time Earnest called as witnesses Professor Nathan Crystal and FBI Special Agent Mike Knapp. (Tr. of Feb. 8, 2018 Hr'g (Doc. 212) at 65, 181.) The United States called as a witness James B. Schwiers, the current President of the Bank. (Id. at 21.)

In addition to the testimony and exhibits presented during the hearing, the court has also considered the affidavit of Earnest, (see Aff. of Ronald Keith Earnest ("Earnest Aff.") (Doc. 119)), and the attachments to pleadings not otherwise objected to by opposing counsel.

For the reasons explained hereafter, this court finds that an attorney-client relationship did not exist between Earnest and Smith Moore during 2012 and 2013 with respect to the ongoing Grand Jury investigation.

## I.  **FACTUAL BACKGROUND**[2]

Smith Moore represented the Bank in civil litigation involving factoring that started around 2008 and may have been resolved in early 2013. (Tr. of Nov. 9, 2017 Hr'g (Doc. 135) at 54-55.) While that case was pending, an individual named Bruce Gregory Harrison, III, was prosecuted and convicted in the Middle District of North Carolina, in a case involving

---

[2] These facts represent the findings of fact by this court. These facts are found from the relevant pleadings, the affidavit of Ronald Earnest, and the testimony presented at the hearings.

transactions in which the Bank had involvement but which involved tax law violations. (See Superseding Indictment (Doc. 10), United States v. Harrison, No. 1:10CR411-1 (M.D.N.C.); Judgment (Doc. 127), United States v. Harrison, No. 1:10CR411-1 (M.D.N.C.).)

On September 11, 2012, following the conviction and sentencing of Harrison, the United States issued a Grand Jury subpoena to the Bank for files related to Harrison and his staffing companies. (See Def. Earnest's Mem. in Supp. of Mot. to Dismiss Indictment ("Def. Earnest's Mem."), Ex. 10, Grand South Bank Sept. 11, 2012 Subpoena (Doc. 146-10).) The subpoena was directed to "GrandSouth Bank, Attn. Legal Order Processing" and sought the production of records and correspondence between the Bank and several entities. (See id. at 1.) Apparently, some of those entities were related to Harrison. Additionally, the subpoena sought the personnel file for Douglas Corriher, the Vice President of the Bank, and various emails between Corriher and others, including Drake. (See id. at 2.) Production was directed to occur on September 24, 2012. (Id. at 1.) Earnest was not mentioned specifically in the subpoena.

Earnest contacted an attorney with Smith Moore "for representation because the firm had done corporate work for the Bank and represented the Bank in related civil litigation."

(Earnest Aff. (Doc. 119) ¶ 3.) Medford, an attorney with Smith Moore and experienced in criminal law, (id. ¶ 4), handled the matter. It is not disputed that Earnest met with Medford and thereafter Medford and Smith Moore began working on the Bank matter.

Bruce Ashley, an attorney with Smith Moore, represented the Bank in a related civil proceeding. Ashley testified that his understanding was that he represented the Bank through his work in civil litigation. (Tr. of Nov. 9, 2017 Hr'g (Doc. 135) at 64.) Ashley recalls rendering legal advice to Earnest, but not in a personal capacity, only to advise the Bank through Earnest as an officer of the Bank. (Id. at 70.) Ashley advised that Medford had primary responsibility for the criminal investigation at Smith Moore. (Id. at 91.)

Laura Dildine was an attorney with Smith Moore beginning in 2011. She testified that when she "came on board, this was an existing matter, and [she] assisted with responding to subpoenas that the Government had served on [the Bank] for documents and in preparing [Bank] employees to testify before the grand jury and the Government's investigation of Doug Corriher." (Id. at 109.) Dildine did not understand the Government to be investigating Earnest or the Bank for criminal conduct. (Id. at 113-14.) Dildine's recollection is that Earnest was "strictly a

fact witness as a bank employee in the Government's investigation of Mr. Corriher . . . in my mind, [Earnest] was testifying . . . as the bank president, but not as someone separate and apart from the bank." (Id. at 123.) Dildine has no recollection of acting as Earnest's attorney "in a personal or individual capacity. Mr. Earnest, from [her] recollection, was [Smith Moore's] primary point of contact for [the Bank]." (Id. at 117.)

This court finds, for purposes of this case, that Medford was lead counsel for the Bank at least during 2012 and 2013 with respect to the Grand Jury investigation. Ashley, although his recollection was limited, significantly participated in the representation, including making arrangements of counsel for Corriher and Drake. While Dildine's participation was extensive in terms of participation in meetings, it appears to this court that Dildine had limited involvement, and perhaps no involvement, in communications with clients or third parties regarding specific representation arrangements.

From mid-2012 through July 2013, Smith Moore met with Earnest and other Bank employees, produced documents of the Bank as called for in the original subpoena issued in September 2012 as well as a second subpoena issued in November 2012. (See Government's Am. Resp. to Def.'s Mot. to Preclude the Disclosure

of Privilege Materials, Attach. 1, Resp. to Subpoena (Doc. 113-1).)

During the period of 2012 until November 2013, the United States advised counsel for Earnest and Drake, as well as Earnest and Drake themselves, that neither individual was a target nor a subject of the Grand Jury investigation. (See Tr. of Nov. 9, 2017 Hr'g (Doc. 135) at 123, 191; Tr. of Mar. 7, 2018 Hr'g (Doc. 248) at 49.) Both individuals were told they were called before the Grand Jury as fact witnesses. (Government's Consolidated Resp. to the Mots. Filed by Def. Shannon Drake on June 9, 2018, ("Government's Consolidated Resp."), Drake Sept. 25, 2012 Grand Jury Test. (Doc. 62-1) at 3; Gov't Consolidated Resp., Ex. 2, Drake May 29, 2013 Grand Jury Test. (Doc. 62-2) at 2; Resp. of the United States to Mot. to Dismiss or Suppress Based on Sixth Amendment Violations ("Government's Sixth Amendment Resp."), Ex. 1, Ronald Earnest Mar. 27, 2013 Grand Jury Test. (Doc. 176-1) at 2-3; Government's Sixth Amendment Resp., Ex. 2, Ronald Earnest Aug. 27, 2013 Grand Jury Test. (Doc. 176-2) at 2.)

Although Dildine and Ashley believed they were counsel for the Bank, there is conflicting evidence as to the nature of the engagement by and between Earnest and Medford. Specifically, Earnest contends:

> 5. During our first meeting in September 2012, Mr. Medford informed me that he had two goals in this

matter: to ensure that neither I, nor the Bank were
indicted. He informed me that he could represent me
individually as well as represent the Bank.

> 6. Thereafter, Mr. Medford and several other
> attorneys of Smith Moore began representing me and the
> Bank. During the course of the investigation, Smith
> Moore also began representing other employees of the
> Bank, including Shannon Drake, David Burgess and David
> Switzer.

(Earnest Aff. (Doc. 119) ¶¶ 5-6.)

Not long after Earnest's meeting with Medford and Smith

Moore in September 2012 when the engagement of Smith Moore began

for purposes of the Grand Jury investigation, Earnest appeared

at the September 19, 2012 board of directors meeting for the

Bank. (Government's Sixth Amendment Resp., ex. 3, Bank Board of

Directors Meeting Agenda and Mins. (176-3) at 2.)[3] According to

the board minutes, Mason Garrett led a discussion regarding

Corriher's receipt of a target letter from the Department of

Justice. (See id. at 3.) The board minutes then recite the

following:

> Mr. Earnest and Mr. Mason Garrett indicated that the
> bank has engaged legal representation for the bank.
> Mr. Corriher has requested that the bank provide legal
> representation for his defense. In consultation with
> the bank's legal representatives, Mr. Jim Medford and
> Mr. Bruce Ashley of the law firm of Smith Moore
> Leatherwood, it was recommended that the bank agree to
> provide an advance of funds to Mr. Corriher, evidenced

---

[3] All citations in this Memorandum Opinion and Order to
documents filed with the court refer to the page numbers located
at the bottom right-hand corner of the documents as they appear
on CM/ECF.

by an agreement titled "Undertaking Regarding Payment
of Legal Fees & Expenses" (the "Undertaking
Agreement") constructed by Mr. Medford which outlines
the terms and conditions under which the bank will
advance the funds for Mr. Corriher's legal defense.
Mr. Earnest also stated that the Leatherwood firm
researched banking law and regulation to ensure that
there were no restrictions on providing the requested
legal assistance to Mr. Corriher. Mr. Bruce Ashley of
the Leatherwood firm indicated that they did not find
any restriction that would prohibit the bank from
providing the support.

(Id. at 2.) The following month, at the October meeting of the

Bank board of directors meeting, the minutes reflect the

following:

Mr. Earnest updated the Board on litigation issues
including the BHC v. Harrison et al case and the
production of documents under subpoena's received by
the Assistant U.S. Attorney (AUSA) related to
investigations in which Doug Corriher has been named
as a target. . . . On the other issue, Mr. Earnest
stated that he and Bert Taylor met with Jim Medford
and Kathy Hawkins of the firm of Smith Moore
Leatherwood in Greensboro, N.C. to deliver and discuss
documentation provided in response to the subpoena.
Mr. Earnest stated that Ms. Hawkins was in the bank on
this date to further understand how the documents were
obtained and meeting with each employee responsible
for the production and to find out if there were any
additional documents that should be provided in
response to the subpoena. Mr. Earnest stated that his
understanding was that the bank's legal counsel will
review the documents, make the appropriate copies,
place in order and deliver to the AUSA. Mr. Earnest
also stated that it was his understanding that Mr.
Medford would attempt to meet with the AUSA at some
point in time to review the documents and his
understanding of the bank's position relative to the
Government's theories about how the bank is involved
in this case. Mr. Earnest further stated that he was
unsure of the time frame for providing the
documentation and the meeting but believed both would

> occur over the next 30 days. The Board discussed Mr.
> Corriher's position and what actions should be taken
> to ensure that this officer does not place the bank in
> jeopardy from actions he may take in his role as the
> manager of the factoring division.

(Government's Sixth Amendment Resp., Ex. 4, Bank Board of

Directors Meeting Agenda and Mins. (Doc. 176-4) at 3.)

These minutes were prepared by Earnest and approved by the

board of directors. (Tr. of Feb. 8, 2018 Hr'g (Doc. 208) at 24,

27.) As a result, these minutes constitute statements of Earnest

as well as statements of the board of directors. Earnest's

statements to the board of directors are also consistent with

his representations to Drake. On September 17, 2012, Earnest

sent Drake an email, with a copy to Medford, advising as

follows:

> Shannon: As I indicated to you earlier, Mr. Jim
> Medford is an attorney with the firm of Smith Moore
> Leatherwood who is representing GrandSouth Bank. I
> have mentioned to Jim that you have been subpoenaed to
> appear before the grand jury and that you may have a
> need to discuss your involvement with our counsel. Jim
> can be reached at [phone number]. If you wish, you may
> call Jim and he can tell you what to expect.

(Minute Entry 02/16/2018 (correspondence contained in binder

produced by the Bank for in camera review).)[4]

---

[4] This email was included in the Bank's disclosures to the
court pursuant to a previous order. Neither Defendant has
requested disclosure of this document. There is nothing to
suggest to this court that this document is privileged and this
court finds that this document is subject to general disclosure.

In light of Earnest's statements to the board of directors, this court is not able to credit Earnest's affidavit that Smith Moore agreed to represent or did represent both the Bank and Earnest personally in September of 2012. (<u>See</u> Earnest Aff. (Doc. 119) ¶¶ 5-6.) Instead, consistent with Earnest's statements to the board, this court finds that Smith Moore was engaged to represent the Bank for reasons explained below.

First, Earnest's statements to the board in September and October 2012 are inconsistent with his affidavit wherein he states that Smith Moore agreed to a dual representation, that is, to represent both the Bank and Earnest individually. The board minutes state that Earnest advised the board he had engaged representation "for the bank." As the Bank President as well as a director, Earnest held a duty to the Bank and the board of directors to act in good faith and in the best interests of the corporation and its shareholders. <u>See</u> S.C. Code Ann. §§ 33-8-300(a), 8-420(a). It appears Earnest's failure to disclose any simultaneous individual representation by Smith Moore would have been a breach of that duty, particularly where, as here, the Bank was funding the representation. Second, it is obvious from the comments to and between the board members that the provision of funds to an individual officer for individual representation during the investigation was a matter of

significant importance and one that required an undertaking as determined by the board. Earnest's silence as to any individual representation that Smith Moore was allegedly providing to Earnest, individually, amounts to a serious omission on the part of Earnest at a time when he was aware of the board's understanding that an undertaking was required. To credit Earnest's statement that Smith Moore represented both Earnest and the Bank would require a finding that Earnest either made a false representation to the board or failed to include material information in his reports to the board. This court finds no reason to believe Earnest intended to mislead the Bank's board at that time, nor would this court find persuasive a representation in this case that tacitly ignores an inconsistent representation to the board.

This court therefore assigns substantial weight to Earnest's statements to the board of directors and the understandings of the Smith Moore attorneys. This court finds that Earnest engaged Medford and Smith Moore to represent the Bank. This court further finds that Earnest clearly understood that Smith Moore was

engaged to represent the Bank as the client and not Earnest individually.[5]

The testimony of Professor Crystal[6] as to Smith Moore's prior representation of Earnest with respect to estate planning and its effect on Earnest's reasonable expectations of individual representation by Smith Moore is not sufficiently persuasive to compel a different finding. Specifically, that

---

[5] It may be that Medford made comments of the type Earnest attributes to Medford, but a comment that Medford "could" represent both the Bank and Earnest is not sufficient to create an attorney-client relationship, see In re Grand Jury Subpoena: Under Seal, 415 F.3d 333, 338 (4th Cir. 2005), and Medford's goals as to the representation were not sufficient to create the relationship.

[6] Professor Crystal, an attorney and law professor, was offered as an expert witness on the attorney-client relationship (Tr. of Feb. 8, 2018 Hr'g (Doc. 212) at 95.) The Government objected to the testimony of Professor Crystal under Federal Rule of Evidence 702, Daubert, and relevance. This court finds that, while Professor Crystal is a knowledgeable attorney, the Government's objection is sustained. Testimony in the form of an opinion or inference otherwise admissible "is not objectionable just because it embraces an ultimate issue" to be decided by the trier of fact. See Fed. R. Evid. 704(a). "However, opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible." United States v. McIver, 470 F.3d 550, 561-62 (4th Cir. 2006) (citations omitted). Here, for the most part, Professor Crystal's opinion involved finding the applicable legal conclusions and law and then applying the law and legal conclusions to the facts. This court differs with Professor Crystal in terms of the facts found and also as to the applicable law. This court did not find Professor Crystal's testimony helpful, in part because of his limited knowledge of certain facts. Nevertheless, this court has considered Professor Crystal's affidavit and explains the court's rejection of that affidavit in certain specific instances.

estate planning engagement, as presented in this case, occurred in 2011 and was limited in both scope and fee. (Tr. of Feb. 8, 2018 Hr'g (Doc. 212) at 98-99.) It was also minor compared to the work Earnest knew Smith Moore performed for the Bank. Furthermore, as Earnest was surely aware, he was responsible for the fee for the estate planning work whereas the Bank paid all of the fees for Smith Moore's work in the matter of the Grand Jury subpoena and the investigation of Corriher. This court therefore rejects the notion that the estate planning work created a reasonable expectation by Earnest that Smith Moore represented him individually in a Grand Jury matter based upon prior discrete estate planning work done personally for Earnest.

This court finds that Medford and Smith Moore entered into an express agreement with the Bank to represent the Bank in September 2012. That agreement was initially entered into by and through Earnest on behalf of the Bank as the Bank's President. That agreement was ultimately ratified, or at least acquiesced in, by the board. This court further finds that Earnest had no expectation at that time, explicit or implicit, reasonable or otherwise, that Medford and Smith Moore represented him individually in the Grand Jury investigation. This court further finds that Earnest did not seek representation from Smith Moore for himself individually.

As noted previously, from mid-2012 through November 2013, Smith Moore met with Earnest and other Bank employees and produced documents of the Bank in response to the Grand Jury subpoenas. (See Government's Am. Resp. to Def.'s Mot. to Preclude the Disclosure of Privilege Materials, Attach. 1, Resp. to Subpoena (Doc. 113-1).) During the course of that production, Earnest was subpoenaed to appear and testified before the Grand Jury in March 2013.

Earnest points to a number of facts which he contends establish the attorney-client relationship between himself, individually, and Medford and Smith Moore. Those facts are generally: Smith Moore's correspondence in 2017 about the representation, (see, e.g., Def. Earnest's Responsive Mem. on the Attorney Client Relationship Between Earnest and SML ("Def. Earnest Mem.") (Doc. 222) at 2-4), his Grand Jury testimony, (see id. at 6-7; Br. in Supp. of Mot. to Preclude the Disclosure of Privileged Materials to the Government ("Earnest Disclosure Mem.") (Doc. 99) at 7-10), his Grand Jury preparation, (see Def. Earnest Mem. (Doc. 222) at 4-5; Earnest Disclosure Mem. (Doc. 99) at 6-7), and the failure of Smith Moore to provide him Upjohn warnings, (Def. Earnest Mem. (Doc. 222) at 4-5; Earnest Disclosure Mem. (Doc. 99) at 5-6).)

This court does not find Smith Moore's correspondence in 2017 either persuasive or relevant to the issue of whether an attorney-client relationship existed between Earnest and Smith Moore between 2012 and 2013. The majority of the cited correspondence appears inconclusive. As Earnest acknowledges, this correspondence is not a denial, (Def. Earnest Mem. (Doc. 222) at 2), but more in the nature of acknowledging a review of the issue.

With respect to the preparation of Earnest prior to his appearance before the Grand Jury, it is clear and this court finds that Earnest was extensively debriefed prior to his two Grand Jury appearances, once on March 27, 2013, and a second time on August 27, 2013. It is also clear from the memos and testimony as to those preparatory debriefings and appearances that they were very extensive, and questions related not only to activities of the Bank as a whole but also to Earnest's knowledge of the activities of Harrison, Corriher, and transactions of the Bank. Nevertheless, while there is no dispute as to the extensive nature of these preparatory and debriefing sessions, this court does not find these facts persuasive or compelling as to the establishment of an attorney-client relationship between Earnest, Medford, and Smith Moore. Smith Moore was engaged to represent the Bank by Earnest,

Earnest was President of the Bank and at least appeared to be Smith Moore's principal point of contact with the Bank. Furthermore, at that time, Smith Moore had been advised that Earnest was neither a target nor a subject of the Grand Jury investigation. As a result, this court finds the following evidence credible: that Earnest was significantly involved with Smith Moore in responding to the Government's investigation, that he was debriefed extensively both before and after his Grand Jury testimony, and that debriefing involved significant questions and responses about the Bank as well as Earnest's knowledge and conduct. However, this court is not able to find as a fact that Earnest's meetings with Smith Moore persuasively establish, as a factual matter, an attorney-client relationship between Earnest, individually, and Smith Moore. Specifically, those facts do not outweigh the fact that Earnest engaged Smith Moore to represent the Bank and not Earnest individually. More significantly, this court does not find that any disclosures by Earnest to Smith Moore were made for the purpose of obtaining legal assistance for Earnest as opposed to the Bank.

On the evidence presented, this court further finds that Smith Moore did not provide Earnest with Upjohn warnings. This court also finds that Medford accompanied Earnest to his Grand Jury appearances and waited outside the Grand Jury room,

available for consultation, during those appearances. This court further finds that while testifying before the Grand Jury on March 27, 2013, and August 27, 2013, Earnest testified in response to direct questioning that he was represented by counsel, Medford, who was present outside the Grand Jury room, prepared to advise Earnest if necessary. (See Earnest Disclosure Mem., Ex. 2, Ronald Earnest Mar. 27, 2013 Grand Jury Test. at 1; Earnest Disclosure Mem., Ex. 3, Ronald Earnest Aug. 27, 2013 Grand Jury Test. at 1.) The foregoing facts are troubling. See In re Grand Jury Subpoena, 415 F.3d at 340 ("It is a potential legal and ethical mine field."). However, this court also finds as a fact that neither Medford nor any attorney from Smith Moore was present for that testimony, nor has any evidence been presented that anyone from Smith Moore was advised of that testimony at that time, nor were attorneys from Smith Moore aware of that testimony. Only Earnest could disclose that testimony to counsel specifically, and only the prosecutor could have possibly recognized the issue with respect to potential confusion between corporate and individual representation and made Smith Moore aware of the full implications of that testimony. There is no evidence of that occurring during 2012 or 2013. Nevertheless, further analysis of these facts is reserved

for the legal analysis of whether an attorney-client
relationship existed.

## II. __ANALYSIS__

As noted above, Earnest alleges that during the course of
the Government's investigation, an attorney-client relationship
existed between himself and Smith Moore, that the attorney-
client privilege attached to certain documents produced during
the course of this relationship, and the presently sought after
disclosure of documents by counsel for the Bank to the United
States was and is a violation of that privilege unless and until
he waives that privilege. The first step in determining whether
any documents now in the custody of the Bank are privileged as a
result of Smith Moore's putative representation of Earnest
requires a determination of whether an attorney-client
relationship existed between Earnest, individually, and Smith
Moore.

Federal Rule of Evidence 501 states that "[t]the common law
— as interpreted by United States courts in the light of reason
and experience — governs a claim of privilege" unless otherwise
provided by the United States Constitution, a federal statute,
or rules prescribed by the Supreme Court. Fed. R. Evid. 501. It
appears to this court that the question of the existence of an
attorney-client relationship with the concomitant privilege is a

matter determined by federal law. See United States v. (Under Seal), 748 F.2d 871, 873-74 (4th Cir. 1984) (stating that the attorney-client privilege "has become part of specialized federal common law"); Fed. Election Comm'n v. Christian Coal., 178 F.R.D. 61, 68 & n.6 (E.D. Va.), aff'd in part, 178 F.R.D. 456 (E.D. Va. 1998) (same).[7]

As the proponent of the attorney-client privilege, Earnest bears "the burden of persuasion as to each element of the privilege." Santrade, Ltd. v. Gen. Elec. Co., 150 F.R.D. 539, 542 (E.D.N.C. 1993) (citation omitted); see also In re Grand Jury Subpoena: Under Seal, 415 F.3d 333, 339 (4th Cir. 2005) ("The person seeking to invoke the attorney-client privilege must prove that he is a client or that he affirmatively sought to become a client.").

> The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law." Upjohn Co. v. United States, 449 U.S. 383, 389, 101 S. Ct. 677, 682, 66 L. Ed. 2d 584 (1981). The privilege protects "not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." Id. at 390, 101 S. Ct. at 683. The purpose of the privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Id. at 389, 101 S. Ct. at 682. But the attorney-client privilege interferes with

---

[7] These cases cite the previous version of the rule, which was amended in 2011 as part of a non-substantive restyling. See Fed. R. Civ. P. 501 advisory committee's note to 2011 amendment.

"the truthseeking mission of the legal process,"
United States v. Tedder, 801 F.2d 1437, 1441 (4th Cir.
1986), cert. denied, 480 U.S. 938, 107 S. Ct. 1585, 94
L. Ed. 2d 775 (1987), because it "is in derogation of
the public's right to every man's evidence." In re
Grand Jury Proceedings, 727 F.2d 1352, 1355 (4th Cir.
1984) (internal quotation marks omitted). Thus, the
privilege "is not favored by federal courts" and "is
to be strictly confined within the narrowest possible
limits consistent with the logic of its principle."
Id. (footnote and internal quotation marks omitted).

United States v. Aramony, 88 F.3d 1369, 1389 (4th Cir. 1996).

Considering whether an attorney-client relationship existed

in the context of a grand jury subpoena for documents, the

Fourth Circuit has stated:

The person seeking to invoke the attorney-client
privilege must prove that he is a client or that he
affirmatively sought to become a client. "The
professional relationship . . . hinges upon the
client's belief that he is consulting a lawyer in that
capacity and his manifested intention to seek
professional legal advice." United States v. Evans,
113 F.3d 1457, 1465 (7th Cir. 1997). An individual's
subjective belief that he is represented is not alone
sufficient to create an attorney-client relationship.
See United States v. Keplinger, 776 F.2d 678, 701 (7th
Cir. 1985) ("We think no individual attorney-client
relationship can be inferred without some finding that
the potential client's subjective belief is minimally
reasonable"); see also, In re. Grand Jury Subpoena
Duces Tecum, 112 F.3d 910, 923 (8th Cir. 1997) ("[W]e
know of no authority . . . holding that a client's
beliefs, subjective or objective, about the law of
privilege can transform an otherwise unprivileged
conversation into a privileged one."). Rather, the
putative client must show that his subjective belief
that an attorney-client relationship existed was
reasonable under the circumstances.

In re Grand Jury, 415 F.3d at 339. The Court went on to state:

> In *Aramony,* this court affirmed the finding of the
> district court that Aramony was not the client of
> internal investigation counsel. The court noted that
> Aramony did not seek legal advice; Aramony could not
> have reasonably believed that the information he
> disclosed would be kept confidential; and internal
> investigation counsel told Aramony that they were
> retained to represent the company.

Id. at n.4 (citing Aramony, 88 F.3d at 1390-92).

Applying the principles outlined by the Fourth Circuit in

In re Grand Jury to this case, this court finds that in

September 2012, no attorney-client relationship was established

between Earnest, individually, and Smith Moore. This court first

finds that Earnest did not seek to become a client; instead,

Earnest engaged Smith Moore to represent the Bank, of which he

was President. Based upon Earnest's statements to the Bank's

board of directors, this court finds Earnest understood and

believed that he engaged Smith Moore to represent the Bank and

was consulting with Smith Moore on behalf of the Bank in his

capacity as an officer of the Bank. See In re Grand Jury

Subpoena, 415 F.3d at 339. Any suggestion by Earnest now that he

believed Smith Moore was engaged to represent him individually

in September 2012 or that he held such an understanding, (see

Earnest Aff. (Doc. 119) ¶ 17), is not credible and is, at a

minimum, subjectively unreasonable.

Nevertheless, Earnest further alleges that he attended

"internal meetings," reviewed documents responsive to the Grand

Jury subpoenas, testified before the Grand Jury on two occasions, and "sought legal advice from [Smith Moore attorneys] and they rendered legal advice to me." (See Earnest Aff. (Doc. 119) ¶¶ 8-9.) There is no evidence that Earnest was ever given an Upjohn warning and, during his appearances before the Grand Jury, Earnest testified in response to direct questioning that he was represented by counsel, Medford, who was present outside the Grand Jury room, prepared to advise Earnest if necessary. (See Earnest Disclosure Mem., Ex. 2, Ronald Earnest Mar. 27, 2013 Grand Jury Test. at 1; Earnest Disclosure Mem., Ex. 3, Ronald Earnest Aug. 27, 2013 Grand Jury Test. at 1.)

In Upjohn v. United States, the Supreme Court held that communications by employees to counsel for the corporation at the direction of corporate superiors to secure legal advice were subject to the corporation's attorney-client privilege and, as a result, were protected against compelled disclosure. See Upjohn v. United States, 449 U.S. 383, 394-95 (1981). The Supreme Court has also recognized that "[t]he administration of the attorney-client privilege in the case of corporations . . . presents special problems. As an inanimate entity, a corporation must act through agents." Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 348 (1985). "One of these special problems is that corporate officers, directors, and employees who communicate

with corporate counsel on behalf of the corporation may later attempt to claim a personal attorney-client privilege regarding those communications after the corporation has waived its own privilege." United States v. Graf, 610 F.3d 1148, 1156 (9th Cir. 2010). This "special problem" is not trivial, as there can be some confusion among corporate employees with respect to whether counsel represents those employees individually, the corporation, or both the individual and the corporation jointly. This problem has been recognized by the Fourth Circuit. See In re Grand Jury Subpoena, 415 F.3d at 340 ("We note, however, that our opinion should not be read as an implicit acceptance of the watered-down 'Upjohn warnings' the investigating attorneys gave the appellants. It is a potential legal and ethical mine field.").

As noted earlier, Earnest participated substantially with Smith Moore in providing information and documents. Earnest was interviewed and debriefed at length by Smith Moore before and after his appearances before the Grand Jury, and was accompanied by Medford to his Grand Jury appearances. Finally, Earnest identified Medford as his attorney during his Grand Jury appearances. Nevertheless, upon consideration of all the evidence, this court does not find an attorney-client relationship to have existed between Medford, Smith Moore, and

Earnest, individually, even during the period Earnest testified
before the Grand Jury in 2013. This court does not find
Earnest's belief that Medford and Smith Moore represented him
individually to be subjectively or objectively reasonable. See
In re Grand Jury Subpoena, 415 F.3d at 339. Even if Earnest held
a subjective belief that Medford and Smith Moore represented him
individually during the period of his Grand Jury testimony, that
subjective belief was not reasonable under the circumstances.

Of significant importance is the fact that Earnest engaged
Medford and Smith Moore to represent the Bank, not Earnest
personally. As a result of the Bank board of directors'
discussion of the necessary undertaking to provide counsel to
Corriher individually, Earnest was aware of the complexities in
providing individual counsel to a Bank officer and took no steps
to communicate to the board or to Smith Moore his request for
individual counsel. There is no evidence that in September 2012
or at any time thereafter Earnest specifically requested
representation on an individual basis. Instead, Earnest states
in his affidavit that he "believed" he "was being provided
individual representation." (Earnest Aff. (Doc. 119) ¶ 17.)
Having found that Earnest expressly engaged Smith Moore and
Medford to represent the Bank, this court does not find
Earnest's subjective belief sufficient to persuasively establish

that at some point he specifically engaged Smith Moore to represent him personally.

Furthermore, there is no evidence that Earnest ever sought or received personal legal advice from Smith Moore for purposes of the Government's investigation of the Bank or his Grand Jury testimony. The privilege applies to "[c]onfidential disclosures by a client to an attorney made in order to obtain legal assistance," Fisher v. United States, 425 U.S. 391, 403 (1976), and Earnest has not identified any disclosures he made that should be considered confidential. To the contrary, it appears the information Earnest provided to Smith Moore was in large part intended to be disclosed to the Government either through the documents subpoenaed or the testimony provided by Earnest.

Although Earnest advised the Grand Jury, in response to questioning, that he had counsel, Medford, outside the Grand Jury room, he does not allege or state that he personally sought advice from Medford. Similarly, although Earnest claims that during one meeting the Assistant United States Attorney and federal agents "were very hostile and accusatory," "accused [him] of being less than truthful," and alleged that he was "purposefully withholding documents," (Earnest Aff. (Doc. 119) ¶ 15), he does not allege or claim that he sought or received advice as to these issues.

Finally, during 2012 and 2013, the prosecutor advised Earnest and Smith Moore attorneys that Earnest was not a target or subject of the investigation. (See Tr. of Nov. 9, 2017 Hr'g (Doc. 135) at 123; Tr. of Mar. 7, 2018 Hr'g (Doc. 248) at 49; Government's Sixth Amendment Resp., Ex. 1, Ronald Earnest Mar. 27, 2013 Grand Jury Test. (Doc. 176-1) at 1; Government's Sixth Amendment Resp., Ex. 2, Ronald Earnest Aug. 27, 2013 Grand Jury Test. (Doc. 176-2) at 1.) Earnest contends that Medford "did not explain to me the differences between a 'fact witness,' a 'subject' of an investigation, or a 'target' of an investigation. Because I was not informed of these concepts, I had no reason to question my status in the investigation." (Earnest Aff. (Doc. 119) ¶ 13.) Contrary to Earnest's statements, Earnest was informed of these concepts. During his March 27, 2013 Grand Jury testimony, the following exchange occurred:

> Q. And, sir, you are not a target of this investigation, nor are you a subject of this investigation. And what that means is we are not – this Grand Jury is not investigating your conduct. You are just simply a factual witness. And do you understand that, sir?
>
> A. I do.

(Government's Sixth Amendment Resp., Ex. 1, Ronald Earnest Mar. 27, 2013 Grand Jury Test. (Doc. 176-1) at 1.) Subsequently,

during his August 27, 2013 testimony, Earnest testified as
follows:

> Q. And I'm again going to advise you of your
> Constitutional rights before we begin asking you
> questions. You are not a target or subject of this
> investigation. You are simply a fact witness. And
> you're aware of that, sir.
>
> A. Yes.

(Government's Sixth Amendment Resp., Ex. 2, Ronald Earnest
Aug. 27, 2013 Grand Jury Test. (Doc. 176-2) at 1.) Earnest had
no reason to question his status in the investigation because he
understood his status as that of a fact witness, and Earnest has
suggested nothing about that status that caused him to seek
legal counsel or advice from Smith Moore.

The facts of <u>United States v. Aramony</u>, 88 F.3d 1369, 1390–
92 (4th Cir. 1996), are very similar to the facts of this case
except for one: in this case, Earnest hired internal
investigation counsel to represent the Bank, thereby in effect
directly engaging counsel to represent the company.

After consideration of the facts and applicable law, this
court finds that no attorney-client relationship was created
between Defendant Earnest and Medford or Smith Moore. This court
therefore finds Earnest has no attorney-client privilege claim
as to any documents currently in the custody of the Bank, or the
Bank's counsel, or the Government as to those records generated

by Smith Moore during its representation of the Bank from 2012 to 2016.

As a result, Earnest's Motion to Preclude the Disclosure of Privileged Materials to the Government, (Doc. 98), Motion to Compel Legal File from Defendant's Prior Attorneys, (Doc. 106), and Motion for Government to Return all Privileged Documents, (Doc. 120), will be denied as a result of this court's finding that no attorney-client relationship or concomitant privilege existed between Defendant Earnest and Smith Moore.

To the extent Defendant's Motion for Discovery on the Disclosure of Information to the Government and Requests for Disclosure, (Doc. 101), is premised upon the existence of an attorney-client relationship between Earnest and Smith Moore, that motion should be denied. Otherwise, the motion will be denied as not ripe in the absence of a showing that disclosure is required under an applicable rule of criminal discovery.

Defendant's Motion for Ex Parte Hearing, (Doc. 115), and Motion to Allow Mr. Earnest to Review SML File prior to Disclosure to the Government, (Doc. 199), will be denied as moot in light of findings in this order and the processes previously implemented to permit disclosure of various records to counsel.

III. **CONCLUSION**

For the reasons stated herein,

**IT IS ORDERED** that Earnest's Motion to Preclude the Disclosure of Privileged Materials to the Government, (Doc. 98), is **DENIED.**

**IT IS FURTHER ORDERED** that Earnest's Motion for Discovery on the Disclosure of Information to the Government and Requests for Disclosure, (Doc. 101), is **DENIED.**

**IT IS FURTHER ORDERED** that Earnest's Motion to Compel Legal File from Defendant's Prior Attorneys, (Doc. 106), is **DENIED.**

**IT IS FURTHER ORDERED** that Earnest's Motion for Ex Parte Hearing, (Doc. 115), is **DENIED AS MOOT.**

**IT IS FURTHER ORDERED** that Earnest's Motion for Government to Return all Privileged Documents, (Doc. 120), is **DENIED.**

**IT IS FURTHER ORDERED** that Earnest's Motion to Allow Mr. Earnest to Review SML File prior to Disclosure to the Government, (Doc. 199), is **DENIED AS MOOT.**

This the 16th day of April, 2018.

_William L. Osteen, Jr._
United States District Judge