IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


UNITED STATES OF AMERICA          )
                                  )    1:16CR205-2
        v.                        )    1:16CR205-3
                                  )    1:16CR205-4
SHANNON MICHELLE DRAKE            )
RONALD KEITH EARNEST              )
ROBERT THOMAS TAYLOR              )


**MEMORANDUM OPINION AND ORDER**

**OSTEEN, JR., District Judge**

Defendant Shannon Michelle Drake ("Drake") has filed several related pretrial motions, including a Motion for Ex Parte Hearing (Doc. 122 (joining Defendant Earnest's Motion (Doc. 115))) and a Motion to Dismiss and Suppress Grand Jury Testimony (Doc. 163).[1] Defendant Drake has also joined in Defendant Earnest's motion to dismiss on Fifth Amendment grounds (Doc. 214).[2] Following a motions hearing, this court requested additional briefing. Defendant Drake filed a supplemental brief,

_____

[1] Although the parties in this case have sealed their motions and supporting briefs, the court does not find it necessary to seal this Memorandum Opinion and Order. Although this court references Grand Jury testimony in passing, said references were addressed in open court at the motions hearing. Any references to Grand Jury testimony of non-parties will refer to witnesses by their initials.

[2] Defendant Earnest's pre-trial motions are addressed by this court in a separate order.

(Doc. 224), to which the Government responded, (Doc. 233). Drake
then filed a motion to strike the Government's Response, (Doc.
235), to which the Government responded, (Doc. 237). On
April 13, 2018, a motions hearing was held at which the parties
addressed the substantive issues within the supplemental
briefing as well as the motion to strike. (Minute Entry
04/13/2018.) For the reasons stated herein, both of Drake's
motions seeking dismissal of the indictment or suppression of
her Grand Jury testimony will be denied and Drake's motion for
an ex parte hearing will be denied as moot. Drake's motion to
strike will also be denied.

I.    **FACTUAL BACKGROUND**

In summary, it is not disputed that during the course of a
criminal investigation by the United States beginning in 2012,
GrandSouth Bank ("the Bank") engaged attorney Jim Medford and
law firm Smith Moore Leatherwood, LLP ("Smith Moore") to
represent the Bank in that investigation. At that time,
Defendant Ronald Earnest ("Earnest") was President and Drake was
an employee of the Bank. It is also undisputed that the Bank was
subpoenaed to appear and produce records to a Grand Jury in the
Middle District of North Carolina as part of that investigation.
These motions by Defendant Drake are all premised upon Drake's

allegation that she was represented in her individual capacity during that investigation by Smith Moore; that she was improperly induced to testify before a Grand Jury conducted in the Middle District of North Carolina; and further that she has not waived attorney-client privilege as to various documents now in the custody of the Bank. The United States is seeking production of those documents in preparation for trial.

As will be explained in more detail below, the United States and a Grand Jury in the Middle District of North Carolina were conducting an investigation into bank fraud and tax violations originating from the prior investigation and eventual prosecution of Gregory Harrison. <u>United States v. Harrison</u>, No. 1:10CR411-1 (M.D.N.C.). The Grand Jury issued a subpoena to the Bank seeking the production of certain records relating to this earlier investigation. Defendant Drake appeared and testified on two occasions, once in 2012 and again in 2013, in response to those subpoenas. On both occasions, the United States advised Drake and her counsel, prior to the Grand Jury and during her Grand Jury testimony, that she was neither a target nor a subject of its investigation. (Government's Consolidated Resp. to Mots. Filed by Def. Shannon Drake on June 9, 2017 ("Government's Consolidated Resp."), Ex. 1, Drake Sept. 25, 2012

Grand Jury Test. (Doc. 62-1) at 3; Government's Consolidated
Resp., Ex. 2, Drake May 29, 2013 Grand Jury Test. (Doc. 62-2)
at 2; Tr. of Nov. 9, 2017 Hr'g (Doc. 135) at 198.)[3] The United
States also specifically advised Defendant Drake that she was
called as a fact witness. (Government's Consolidated Resp.,
Drake Sept. 25, 2012 Grand Jury Test. (Doc. 62-1) at 3;
Government's Consolidated Resp., Ex. 2, Drake May 29, 2013 Grand
Jury Test. (Doc. 62-2) at 2.)

As it turns out, Drake's status, at least in the two weeks
prior to her second appearance, was something more complex. This
order addresses three issues: (1) whether an attorney-client
relationship existed between Drake and Smith Moore during 2012
and 2013 in the matter of the Grand Jury investigation; (2)
whether the Government's advice to Drake, that she was neither a
target nor a subject of the investigation, was accurate or
whether it was misleading; and (3) if misleading, whether a
remedy is appropriate in this case as a result of: (a) this
court's supervisory powers over grand jury proceedings and/or
(b) constitutional violations.

---

[3] All citations in this Memorandum Opinion and Order to
documents filed with the court refer to the page numbers located
at the bottom right-hand corner of the documents as they appear
on CM/ECF.

## II. **PROCEDURAL HISTORY**

Drake was originally indicted on June 28, 2016. (Indictment (Doc. 1) at 1.) Subsequently, the Grand Jury returned superseding indictments, and the currently operative Superseding Indictment was returned on August 29, 2017. (Superseding Indictment (Doc. 85) at 1.) Various proceedings took place and this case was ultimately assigned to this court. (Order of Recusal (Doc. 110) at 2-3.) As noted above, a number of motions were filed, and on November 9, 2017, a hearing was held during which the parties presented evidence as to whether there was an attorney-client relationship between Earnest and Smith Moore and/or Drake and Smith Moore and, if so, what documents may be privileged. (Tr. of Nov. 9, 2017 Hr'g (Doc. 135) at 19-20.) Present at that hearing were the parties and their counsel; Jon Berkelhammer on behalf of Smith Moore; and Dan Boyce, Mark Moore, and Andrew Mathias on behalf of the Bank. This court overruled Smith Moore's objection as to attorney-client privilege in part and permitted the testimony of current and former Smith Moore attorneys. (Tr. of Nov. 9, 2017 Hr'g (Doc. 135) at 46-47.) This testimony was subject to specific objections raised by counsel during the hearing. (Id.) This court did not issue a final ruling with respect to the objection

as to the production of documents. (Id. at 224.) Both counsel for Smith Moore and the Bank were permitted to participate during the hearing for the purpose of lodging any objections to specific questions propounded by the parties. (Id. at 46-47.)

Defendant Earnest called as witnesses Bruce Ashley, Laura Dildine, and Stephen Petersen, all of whom were attorneys at Smith Moore during the relevant time period. The hearing was continued to February 8, 2018, at which time Defendant Earnest called as witnesses Professor Nathan Crystal and FBI Special Agent Mike Knapp. (Tr. of Feb. 8, 2018 Hr'g (Doc. 212) at 65, 181.) The United States called as a witness James B. Schwiers, the current President of the Bank. (Id. at 21.) A subsequent hearing was held on March 7, 2018, at which time Defendant Earnest called as witnesses Special Agent Mary Blackerby, Agent Kyle Myles, and Professor Nathan Crystal. (Tr. of Mar. 7, 2018 Hr'g (Doc. 248) at 3.)

In addition to the testimony and exhibits presented during the hearings, the court has also considered the attachments to pleadings not otherwise objected to by opposing counsel.

## III. **ANALYSIS**

This court now determines (1) whether or not an attorney-client relationship existed between Drake and Smith Moore during

2012 and 2013 in the matter of the Grand Jury investigation; (2) whether the Government's advice to Drake, that she was neither a target nor a subject of the investigation, was accurate or whether it was misleading; and (3) if misleading, whether the Government's conduct requires or allows suppression of Drake's testimony or dismissal of the indictment as the result of (a) this court's supervisory powers over grand jury proceedings and/or (b) constitutional violations.

### A. Whether an Attorney-Client Relationship Existed Between Drake and Smith Moore

Smith Moore represented the Bank in civil litigation involving factoring that started around 2008 and may have been resolved in early 2013. (Tr. of Nov. 9, 2017 Hr'g (Doc. 135) at 54-55.) While that civil case was pending, an individual named Bruce Gregory Harrison, III, was prosecuted and convicted in the Middle District of North Carolina, <u>United States v. Harrison</u>, No. 1:10CR411-1 (M.D.N.C.), apparently for tax violations that were related to transactions in which the Bank had some involvement.

On September 11, 2012, following the conviction and sentencing of Harrison, the United States issued a Grand Jury subpoena to the Bank for files related to Harrison and his staffing companies. (<u>See</u> Def. Earnest's Mem. in Supp. of Mot. to

- 7 -

Dismiss Indictment ("Def. Earnest's Mem."), Ex. 10, GrandSouth Bank Sept. 11, 2012 Subpoena (Doc. 146-10).) The subpoena was directed to "GrandSouth Bank, Attn. Legal Order Processing" and sought the production of records and correspondence between the Bank and several entities. (See id.) Apparently, some of those entities were related to Harrison. Additionally, the subpoena sought the personnel file for Douglas Corriher, the Vice President of the Bank, and various emails between Corriher and others, including Drake. (See id. at 2.) Production was directed to occur on September 24, 2012. (Id. at 1.) Earnest was not mentioned specifically in the subpoena.

Earnest contacted an attorney with Smith Moore "for representation because the firm had done corporate work for the Bank and represented the Bank in related civil litigation." (Earnest Aff. (Doc. 119) ¶ 3.) Jim Medford, an attorney with Smith Moore and experienced in criminal law, (id. ¶ 4), handled

the matter.[4] It is not disputed that Earnest met with Medford and thereafter Medford and Smith Moore began working on the Bank matter.

Bruce Ashley, an attorney with Smith Moore, represented the Bank in a related civil proceeding. Ashley testified that his understanding was that he represented the Bank through his work in civil litigation. (Tr. of Nov. 9, 2017 Hr'g (Doc. 135) at 64.) Ashley recalls attending a meeting with Medford and Drake after Drake testified before the Grand Jury for the first time. (Id. at 93-94.) Ashley testified that Medford had primary responsibility for the Bank's criminal investigation at Smith Moore. (Id. at 91.)

---

[4] Due to health concerns, Medford did not testify during this hearing. Instead, counsel for Smith Moore proffered what Medford would testify to were he called as a witness. (Tr. of Nov. 9, 2017 Hr'g (Doc. 135) at 23 ("Mr. Medford would testify that he does recall GrandSouth Bank as a client of the firm of Smith Moore Leatherwood, but he has no memory of what he did for GrandSouth Bank. He recalls the names 'Ronald Earnest' and 'Shannon Drake,' but he does not recall any work done with or for them. He does not recall the work for some of his other – for his other clients or does not recall really his other clients.").) Defense counsel and the Government consented to this proffer. (Id. at 22-23.)

Laura Dildine was an attorney with Smith Moore beginning in 2011.[5] She testified that when she "came on board, this was an existing matter, and [she] assisted with responding to subpoenas that the Government had served on GrandSouth Bank for documents and in preparing GrandSouth Bank employees to testify before the grand jury and the Government's investigation of Doug Corriher." (Id. at 109.) Dildine did not understand the Government to be investigating Earnest or the Bank for criminal conduct. (Id. at 113-14.) Dildine's recollection is that Earnest was "strictly a fact witness as a bank employee in the Government's investigation of Mr. Corriher. . . . in my mind, [Earnest] was testifying . . . as the bank president, but not as someone separate and apart from the bank." (Id. at 123.) Dildine has no recollection of acting as Earnest's attorney "in a personal or individual capacity. Mr. Earnest, from [her] recollection, was [Smith Moore's] primary point of contact for [the] Bank." (Id.

---

[5] At the November 9, 2017 motions hearing, Earnest's counsel examined Dildine. Drake's counsel declined to examine Dildine. (Tr. of Nov. 9, 2017 Hr'g (Doc. 135) at 167 ("Your Honor, since this is Mr. Earnest's motion, and she has not addressed Ms. Drake, I reserve the right perhaps in the future to call her back if there is a dispute about representation. But at this time I don't have any questions.").) The above testimony is summarized to the extent that it provides context as to how Smith Moore attorneys viewed their participation in the Grand Jury investigation.

at 117.) Dildine testified that she did not recall that any officers or employees of the Bank were targets of the Government's investigation. (See id. at 112, 122, 164-65.)

This court finds, for purposes of this case, that Jim Medford was lead counsel for the Bank at least during 2012 and 2013 with respect to the Grand Jury investigation. Ashley, although his recollection was limited, significantly participated in the representation, including making arrangements of counsel for Corriher and Drake. While Dildine's participation was extensive, it appears to this court that Dildine had limited involvement, and perhaps no involvement, in communications with clients regarding specific representation arrangements but instead acted primarily at the direction of Medford.

From September 2012 through July 2013, Smith Moore met with Earnest, Drake, and other Bank employees, produced Bank documents as called for in the original subpoena issued in September 2012 as well as a second subpoena issued in November 2012. (See Government's Am. Resp. to Def.'s Mot. to Preclude the Disclosure of Privilege Materials, Attach. 1, Resp. to Subpoena (Doc. 113-1).)

Notably, during the period of mid-2012 until November 2013, the United States advised counsel for Earnest and Drake, as well as Earnest and Drake themselves, that neither individual was a target nor a subject of the Grand Jury investigation. (Government's Consolidated Resp., Ex. 1, Drake Sept. 25, 2012 Grand Jury Test. (Doc. 62-1) at 3; Government's Consolidated Resp., Ex. 2, Drake May 29, 2013 Grand Jury Test. (Doc. 62-2) at 2; Tr. of Nov. 9, 2017 Hr'g (Doc. 135) at 198.) Both individuals were told they were called before the Grand Jury as fact witnesses. (Government's Consolidated Resp., Drake Sept. 25, 2012 Grand Jury Test. (Doc. 62-1) at 3; Government's Consolidated Resp., Ex. 2, Drake May 29, 2013 Grand Jury Test. (Doc. 62-2) at 2; Resp. of the United States to Mot. to Dismiss or Suppress Based on Sixth Amendment Violations ("Government's Sixth Amendment Resp."), Ex. 1, Ronald Earnest Mar. 27, 2013 Grand Jury Test. (Doc. 176-1) at 2-3; Government's Sixth Amendment Resp., Ex. 2, Ronald Earnest Aug. 27, 2013 Grand Jury Test. (Doc. 176-2) at 2.)

### 1. **Drake's First Grand Jury Appearance**

Drake alleges in her affidavit that she received a subpoena to appear before a Grand Jury in the Middle District of North Carolina on September 25, 2012. (Tr. of Feb. 8, 2018 Hr'g (Doc.

212), Ex. 3, Aff. of Shannon Michelle Drake ("Drake Aff."),

¶¶ 5-6.)[6] Drake further alleges that attorneys from Smith Moore

contacted her and said they were going to represent her in

connection with her testimony before the Grand Jury. (Id. ¶ 5.)

A subpoena was in fact issued to "Shannon Drake, Account

Executive" on September 11, 2012, compelling her appearance and

testimony before the Grand Jury on September 24, 2012.

(Government's Notice Containing Grand Jury Subpoenas

("Government's Notice"), Ex. 1, Subpoenas (Doc. 207-1) at 1-2.)

That subpoena appears to have been issued at the same time as

the subpoena mentioned above was issued directly to the Bank.

(See id. at 4-5.)

On September 17, 2012, Earnest sent Drake an email, with a

copy to Jim Medford, advising as follows:

> Shannon: As I indicated to you earlier, Mr. Jim
> Medford is an attorney with the firm of Smith Moore
> Leatherwood who is representing GrandSouth Bank. I
> have mentioned to Jim that you have been subpoenaed to
> appear before the grand jury and that you may have a
> need to discuss your involvement with our counsel. Jim
> can be reached at [phone number]. If you wish, you may
> call Jim and he can tell you what to expect.

---

[6] At the February 8 and March 7, 2018 hearings, both
Defendant Earnest and Defendant Drake submitted evidence. All
citations to evidence admitted at the hearings will correspond
to the official exhibit list maintained by the clerk as to
Drake.

(Minute Entry 02/16/2018 (correspondence contained in binder produced by the Bank for in camera review).)[7]

On September 18, 2012, Bruce Ashley with Smith Moore sent a letter to the Assistant United States Attorney ("AUSA") discussing the subpoena to the Bank and the subpoena to Drake. (Tr. of Mar. 7, 2018 Hr'g (Doc. 248), Ex. 5, September 18, 2012 Letter from Bruce Ashley.) With respect to Drake, Ashley wrote:

> Also, as I indicated in my voice messages this week, we will be representing Shannon Drake, the [Bank] employee who recently received a witness subpoena from your office. Please contact us when you would like Ms. Drake to appear. In this regard, please keep in mind that Ms. Drake is based in the Greenville, South Carolina area, and at least two business days' notice would be very much appreciated.

(Id.) Jim Medford was copied on that letter, but none of the other Smith Moore attorneys were copied. Ashley testified that he had no independent recollection of the letter, but did not have any reason to believe it was not accurate. (Tr. of Nov. 9, 2017 Hr'g (Doc. 135) at 92.)

Drake appeared and testified before the Grand Jury on September 25, 2012. The transcript of that testimony reflects

_____

[7] This email was included in the Bank's disclosures to the court pursuant to a previous order. (Feb. 13, 2018 Order (Doc. 208) at 1.) Neither Defendant has requested disclosure of this document. There is nothing to suggest to this court that this document is privileged and this court finds that this document is subject to general disclosure.

that Drake was initially advised that she was "not a target of this Grand Jury investigation, nor are you a subject of it. And what that means is this Grand Jury is not investigating you, you are simply a fact witness in this investigation." (Def. Earnest's Mem., Ex. 6, Drake's Sept. 25, 2012 Grand Jury Test. (Doc. 146-6) at 3.) After that advice, the following examination occurred:

> Q. Okay. And you have an attorney representing you today, do you not?
>
> A. Yes, sir.
>
> Q. And that's Mr. Medford?
>
> A. Yes, sir.
>
> Q. And he's present outside the Grand Jury room?
>
> A. Yes.
>
> Q. And you understand that at some point if you would like to speak with him, we'll take a break and you can step out?
>
> A. Yes, sir.

(Id. at 5-6.)

This court finds Drake's statements in her affidavit as well as to the Grand Jury, that Smith Moore represented her for purposes of her Grand Jury testimony on September 25, 2012, to

be credible. An attorney-client relationship was formed between Drake and Smith Moore in September 2012. That relationship extended at least from September 18, 2012 through the conclusion of her debriefing following her appearance before the Grand Jury on September 25, 2012.

### 2. Drake's Second Grand Jury Appearance

Following Drake's appearance on September 25, 2012, it does not appear Drake continued to meet with Smith Moore or to have any direct involvement in the case until May 2013. On May 16, 2013, a subpoena was issued compelling Drake to appear and testify before a Grand Jury on May 28, 2013. (Government's Notice, Ex. 1, Subpoenas (Doc. 207-1) at 37.)

During Drake's second Grand Jury appearance, the prosecutor asked her "are you represented by attorneys today?" to which she responded "I have attorneys with me that represent the bank. . . . Steve and Laura. I'm not sure of their last names." (Government's Consolidated Resp., Drake May 29, 2013 Grand Jury Test. (Doc. 62-2) at 4.) The prosecutor then stated "so they're, technically, the bank's attorneys, but they're here[,]" to which Drake responded "[y]es." (Id.)

Prior to her appearance before the Grand Jury in May, 2013, Drake again met with attorneys at Smith Moore. One of those

attorneys was Stephen Petersen, who had previously participated briefly in the Bank investigation in 2012, solely to help arrange counsel for Corriher and "get the undertaking done." (Tr. of Nov. 9, 2017 Hr'g (Doc. 135) at 173.) In May of 2013, Petersen helped with Drake's appearance before the Grand Jury. (Id.)

When Drake was subpoenaed to testify before the Grand Jury in May 2013, Medford was having surgery. Petersen was called on May 22 to help prepare Drake. (Tr. of Nov. 9, 2017 Hr'g (Doc. 135) at 173-74.) Petersen met with Drake on May 23 to prepare for Drake's testimony before the Grand Jury. (Id. at 135.) Other individuals present at the May 23 meeting included Cathy Hawkins, a Smith Moore paralegal, and Laura Dildine. (Id. at 188.) Jim Medford participated by telephone. (Id. at 189.)

Drake states in her affidavit the following with respect to her May 2013 Grand Jury appearance:

> I was contacted again in May 2013 by someone from Smith Moore, who told me the government wanted me to appear before the grand jury again. I again went to Smith Moore's Greensboro offices in or around May 23, 2013. At that time, I met with several lawyers and Jim Medford was on the phone. At no time, was I told that Smith Moore did not represent me. They told me they would again be outside the door when I testified before the grand jury and would provide advice and guidance to me if I had any questions during my testimony.

(Tr. of Feb. 8, 2018 Hr'g (Doc. 212), Ex. 3, Drake Aff., ¶ 8.)

However, contrary to Drake's affidavit, Petersen testified that

he provided Drake with an Upjohn warning. (Tr. of Nov. 9, 2017

Hr'g (Doc. 135) at 174.) Petersen testified that he advised

Drake that he represented the "entity," referring to the Bank,

and if she wanted her own counsel, they would get her counsel.

(Id. at 175.) Specifically, Petersen testified:

> If I am representing a corporate entity, and one of
> the employees or officers of the corporation gets a
> grand jury subpoena, I will meet with them and tell
> them that I represent the entity, I am here to prep –
> help prep you if you want me to. If you want your own
> counsel, we'll get you your own counsel. That's
> essentially what happened with Shannon Drake, and she
> said, "got it."

(Id. at 175; see also id. at 189-90 (Petersen testifying that he

did not get Drake to sign the Upjohn warning and that he does

not remember whether memos or notes from these meetings reflect

whether an Upjohn warning was given).) Drake's Grand Jury

testimony excerpted above is consistent with an Upjohn warning

having been given by Petersen, as it acknowledged that both

Petersen and Dildine were the Bank's attorneys.

This court finds Petersen's testimony that he provided an

Upjohn warning credible, and further finds his testimony

credible that he offered to assist Drake with finding her own

counsel. Correspondingly, this court rejects Drake's affidavit

in part wherein she states that she was never told that Smith Moore did not represent her, as this court finds, specifically, that Petersen did tell Drake that he (Petersen) did not personally represent her.

The notes from a meeting involving Medford, Dildine, and the prosecutor on May 23, 2013, suggest that the prosecutor understood that Medford represented the Bank but not Drake individually. (United States' Opp'n to Def. Shannon Drake's Mot. to Dismiss the Indictment ("Government's Opp'n Br."), Ex. 4, Dildine May 23, 2013 Notes (Doc. 233-4) at 5 ("You guys rep[resent] bank [and] not individual.").) This makes the notes confusing, as Ashley had previously written the prosecutor to say that Smith Moore represented Drake. (Tr. of Mar. 7, 2018 Hr'g (Doc. 248), Ex. 5, September 18, 2012 Letter from Bruce Ashley.) Medford's comments, as reflected in these notes, seem to suggest he does represent Drake, and the discussion relates to a conflict. (Government's Opp'n Br., Ex. 4, Dildine May 23, 2013 Notes (Doc. 233-4) at 5 ("We've looked carefully at her role – what she knows: no problem.").) In the absence of any further explanation of Medford's continuing role in the matter, or any evidence to suggest that Medford either gave Drake an Upjohn warning or terminated his attorney-client relationship

with Drake, this court finds that Medford and, as a result,

Smith Moore, continued to have an attorney-client relationship

with Drake relating to her Grand Jury appearance in May 2013.

Cf. K.C. v. Cansler, No. 5:11-CV-354-FL, 2012 WL 12914654, at

n.16 (W.D.N.C. Jan. 10, 2012).

### 3.  Analysis

Considering whether an attorney-client relationship existed

in the context of a grand jury subpoena for documents, the

Fourth Circuit has stated:

> The person seeking to invoke the attorney-client
> privilege must prove that he is a client or that he
> affirmatively sought to become a client. "The
> professional relationship . . . hinges upon the
> client's belief that he is consulting a lawyer in that
> capacity and his manifested intention to seek
> professional legal advice." United States v. Evans,
> 113 F.3d 1457, 1465 (7th Cir. 1997). An individual's
> subjective belief that he is represented is not alone
> sufficient to create an attorney-client relationship.
> See United States v. Keplinger, 776 F.2d 678, 701 (7th
> Cir. 1985)("We think no individual attorney-client
> relationship can be inferred without some finding that
> the potential client's subjective belief is minimally
> reasonable"); see also, In re. Grand Jury Subpoena
> Duces Tecum, 112 F.3d 910, 923 (8th Cir. 1997) ("[W]e
> know of no authority . . . holding that a client's
> beliefs, subjective or objective, about the law of
> privilege can transform an otherwise unprivileged
> conversation into a privileged one."). Rather, the
> putative client must show that his subjective belief
> that an attorney-client relationship existed was
> reasonable under the circumstances.

In re Grand Jury Subpoena: Under Seal, 415 F.3d 333, 339 (4th Cir. 2005). The court went on to state:

> In Aramony, this court affirmed the finding of the district court that Aramony was not the client of internal investigation counsel. The court noted that Aramony did not seek legal advice; Aramony could not have reasonably believed that the information he disclosed would be kept confidential; and internal investigation counsel told Aramony that they were retained to represent the company.

Id. at n.4 (citing United States v. Aramony, 88 F.3d 1369, 1390–92 (4th Cir. 1996)).

This court finds that Drake's subjective belief that she was represented by Medford and ultimately Smith Moore to be reasonable in light of her circumstances. Earnest, Drake's supervisor, told her she "may call [Medford] and he can tell you what to expect." (Minute Entry 02/16/2018 (correspondence contained in binder produced by the Bank for in camera review).) Drake then met with Smith Moore attorneys, including Medford, to prepare for her Grand Jury appearance. Drake's subjective belief that she was individually represented by Medford and Smith Moore for purposes of her Grand Jury appearance is evidenced by her answers before the Grand Jury regarding whether she was represented as well as statements in her affidavit.

The objective reasonableness of Drake's beliefs is evidenced by her stating in her affidavit that Smith Moore

attorneys told her that "they would again be outside the door when [she] testified before the grand jury and would provide advice and guidance to [her] if [she] had any questions during [her] testimony," (Tr. of Feb. 8, 2018 Hr'g (Doc. 212), Ex. 3, Drake Aff., ¶ 8), as well as Ashley's letter to the Government stating that "we will be representing Shannon Drake," (Tr. of Mar. 7, 2018 Hr'g (Doc. 248), Ex. 5, September 18, 2012 Letter from Bruce Ashley). Despite evidence to suggest that Drake understood at the time of her second Grand Jury Appearance that neither Petersen nor Dildine represented her individually, there is no evidence to suggest that Drake understood (1) that Medford did not represent her individually or (2) that Smith Moore did not represent both her and the Bank.

This court finds that Drake reasonably believed that she was receiving legal advice from her own attorney throughout the course of her first Grand Jury appearance. In the absence of any Upjohn warning from Medford, or some further evidence as to Medford's status during the second Grand Jury appearance, this court finds that Drake had a reasonable belief that Medford's representation of her continued at that time. This court finds these circumstances sufficient to conclude that an attorney-client relationship did exist between Drake and Medford and

ultimately Drake and Smith Moore during Drake's May 2013 Grand Jury appearance.[8] As a result, this court finds that Drake does hold an attorney-client privilege with Medford and Smith Moore.

## B. Whether the Government's Advice to Drake that She was Neither a Target or Subject of the Investigation was Accurate or Misleading

The primary factual issue underlying Drake's motions to dismiss is the question of whether the Government misled "Ms. Drake and Smith Moore about her status by repeatedly stating that she was not a subject or target but merely a fact witness." (Suppl. Mem. in Supp. of Shannon Drake's Mot. to Dismiss Relating to Prosecutorial Misconduct and Her Grand Jury Test. ("Drake Suppl. Mem.") (Doc. 224) at 3.)

It is true that "[t]he Attorney General and United States Attorneys retain 'broad discretion' to enforce the Nation's criminal laws. They have this latitude because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility . . . ." United States v. Armstrong, 517 U.S. 456, 464 (1996) (citations

---

[8] This is an unusual factual scenario, and determining facts and attorney-client relationships has proven difficult. There appears to have been concerns about Medford's possible conflict of interest, (Government's Opp'n Br., Ex. 4, Dildine May 23, 2013 Notes (Doc. 233-4) at 5), but these issues were permitted to continue and it does not appear either Medford or the Government took steps to clarify representation.

omitted). "[T]he Government retains 'broad discretion' as to whom to prosecute." Wayte v. United States, 470 U.S. 598, 607 (1985) (citations omitted). In exercising that discretion, the Government is under no constitutional or statutory duty to advise an individual of a target warning. See United States v. Washington, 431 U.S. 181, 189 (1977); United States v. Crocker, 568 F.2d 1049, 1055-56 (3d Cir. 1977), abrogated on other grounds by United States v. Gaudin, 515 U.S. 506 (1995). Absent some inherent authority of the court, see United States v. Jacobs, 547 F.2d 772, 774-75 (2d Cir. 1976), this court cannot compel the Government to make someone a target or subject of an investigation or to notify that individual of such status. Nor is this court aware of any prohibition on a change in status of an individual as an investigation progresses. In other words, there is no constitutional or statutory duty that prohibits a prosecutor from proceeding with an investigation targeting an individual after that individual has been advised that he or she is neither a target nor a subject of an investigation. Those are all matters for the exercise of the discretion of the Attorney General generally. For example, the Government has argued that Drake was not a target of the Grand Jury in 2012 and 2013, (Government's Opp'n Br. (Doc. 233) at 14), and further argues

that it was only after years of investigation and Grand Jury testimony in 2015 and 2016 that Drake's incriminating role in the scheme was revealed, (Id. at 5-6). These matters may be literally correct, as the Government may not have taken concrete steps to designate Drake as a formal target within the Department of Justice ("DOJ"), and the Government may have determined in 2013 to exercise its discretion[9] to not target Drake as a putative defendant in 2013.

However, the Government's discretion and the processes associated with that discretion are not at issue in this case. Instead, this case presents the question of whether the Government, in its communications to counsel and a Grand Jury witness misled those individuals. Specifically, whether the Government's representation to Drake and her counsel that Drake was neither a target nor a subject of the investigation and was being called to testify as a fact witness was misleading. If this representation was misleading, the question then becomes whether this court has the authority to address the misrepresentation.

---

[9] As will be explained hereafter, there is no evidence to suggest the Government decided in 2013 to exercise its discretion to not prosecute Drake.

The terms "target" and "subject" carry no inherent constitutional or statutory significance. They are terms of art, created by the Department of Justice ("DOJ") to communicate specific information to attorneys and individuals during the course of a criminal investigation by the United States. Specifically, the DOJ defines a "target" as "a person to whom the prosecutor or the grand jury has substantial evidence linking him or her to the commission of a crime, and who, in the judgment of the prosecutor, is a putative[10] defendant." [11] Dep't of Justice, U.S. Attorneys' Manual § 9-11.151 (emphasis added).

---

[10] "Putative" is defined as: "Reputed; believed or supposed by most people." Black's Law Dictionary (10th Ed. 2014). It seems clear from the May 5 email that at least one, and perhaps two prosecutors, believed Drake to be a putative defendant meriting consideration for a plea bargain. Nevertheless, the definition is founded on belief or supposition and does not require certainty. See also infra note 11.

[11] As explained by the Third Circuit in Crocker, "the test as to whether a witness is a target of a grand jury investigation cannot be whether he 'necessarily' will be indicted, but whether according to an objective standard he could be indicted." 568 F.2d at 1054 (emphasis added).

A "subject" is defined by the DOJ as "a person whose conduct is within the scope of the grand jury's investigation." Id.[12]

It may very well be that Drake was neither a target nor a subject of the Grand Jury's investigation in 2012 and 2013 as that Grand Jury formally understood at that time and as argued by the Government, but that fact is not dispositive as to the circumstances of this case. A federal grand jury and the DOJ are separate entities. "[T]he grand jury is mentioned in the Bill of Rights, but not in the body of the Constitution. It has not been textually assigned, therefore, to any of the branches described in the first three articles. It is a constitutional fixture in

---

[12] This court notes that "the internal guidelines of a federal agency, that are not mandated by statute or the constitution, do not confer substantive rights on any party." United States v. Craveiro, 907 F.2d 260, 264 (1st Cir. 1990); see also United States v. Caceres, 440 U.S. 741, 749-55 (1979). The designation of "target" is not mandated by statute or the Constitution. Nevertheless, "[a]n agency of the government must scrupulously observe rules, regulations, or procedures which it has established." United States v. Heffner, 420 F.2d 809, 811 (4th Cir. 1969). Even if a defendant has no substantive right to notice of a "target" designation, a prosecutor knows what the term means as the term is defined by the Department of Justice and fully understands what is communicated when an individual or counsel are told the individual is not a target.

its own right." United States v. Williams, 504 U.S. 36, 47 (1992) (citations omitted).[13]

Because the grand jury and a prosecutor are two separate, independent entities, either the prosecutor or the grand jury may investigate evidence of criminal wrongdoing. This distinction is reflected in the DOJ's definition of "target," which recognizes that a target may be one recognized by either the prosecutor or the grand jury. See Dep't of Justice, U.S. Attorneys' Manual § 9-11.151 (defining target as "a person to whom the prosecutor or the grand jury has substantial evidence linking him or her to the commission of a crime").

---

[13] Both the Constitution and the Supreme Court have explained the separation and independence of a prosecutor and a grand jury. The Fifth Amendment requires that "federal prosecutions for capital and otherwise infamous crimes must be instituted by presentments or indictments of grand juries." Costello v. United States, 350 U.S. 359, 361 (1956). "This constitutional guarantee presupposes an investigative body 'acting independently of either the prosecuting attorney or judge' whose mission is to clear the innocent, no less than to bring to trial those who may be guilty." United States v. Dionisio, 410 U.S. 1, 16-17 (1973) (citation and footnote omitted); see also Hoffman v. United States, 341 U.S. 479, 485 (1951) ("[W]hile grand juries may proceed, either upon their own knowledge or upon the examination of witnesses to inquire . . . whether a crime cognizable by the court has been committed, yet the most valuable function of the grand jury (has been) not only to examine into the commission of crimes, but to stand between the prosecutor and the accused[.]" (citation omitted)).

In 2012 and 2013, the DOJ was conducting an investigation related to bank fraud committed by Doug Corriher through the Grand Jury and through other agencies and entities. Therefore, a representation by an AUSA that an individual is neither a target nor a subject, but only a fact witness in that investigation, communicates information to several parties – counsel, individuals testifying before the Grand Jury, the Grand Jury, and this court – upon which those parties rely and act. By using the DOJ's definition, that statement communicates that the individual is not "a person to whom the prosecutor or the grand jury has substantial evidence linking him or her to the commission of a crime, and who, in the judgment of the prosecutor, is [not] a putative defendant." See id. In making the statements in question to Drake and her attorneys, the Government communicated to them that neither the prosecutor nor the Grand Jury had substantial evidence linking Drake to the commission of a crime, and further that Drake, in the judgment of the prosecutor, was not a putative defendant.

Nevertheless, in spite of the representation from the Government that Drake was neither a target nor a subject, an email sent by the prosecutor to investigators on May 5, 2013, roughly a little more than two weeks before Drake's second

appearance before the Grand Jury, contained the following

statements:

> Here are my thoughts on what needs to be done on
> Corriher:
>
> . . . .
>
> 3. We need to decide if we want to treat Shannon
> Drake as a target. She is a bank officer. While I do
> not believe there is evidence she knew about the
> taxes, she was an essential cog in the Five Guys
> system and was well aware that these loans were a
> nominee arrangement. It would help to get her an
> attorney of her own. Give her a break in response for
> full testimony or make her eat a false entry on bank
> books charge (venue issues aside)?

(Tr. of Mar. 7, 2018 Hr'g (Doc. 248), Ex. 3, May 5, 2013 email.)

The Government argues that this email does not demonstrate

that Drake was a target of the investigation in 2013. Instead,

the Government argues:

> The government did consider in 2013 whether Drake
> should be made a target of the investigation at that
> time. By email dated May 5, 2013 . . . the AUSA raised
> the prospect of whether Drake should be treated as a
> target based on her proximity to the nominee lending
> scheme within [the] Bank. The AUSA intended to raise a
> discussion point for the investigation team;
> consideration and re-consideration of targets is
> common during large investigations . . . Nothing in
> that email suggests a plan to mislead or trick Drake.
> Rather, it shows that, if Drake were targeted, the
> government would have acted to ensure that she had her
> own counsel.

(Government's Opp'n Br. (Doc. 233) at 16-17.) This court

disagrees.

The email does more than query whether "Drake should be targeted based on her proximity to the nominee lending scheme within [the] Bank."[14] First, the email suggests far more than proximity to an unlawful scheme. The email states: "Drake was an essential cog in the Five Guys system and was well aware that these loans were a nominee arrangement." (Tr. of Mar. 7, 2018 Hr'g (Doc. 248), Ex. 4, May 5, 2013 email.) While that phrase might be suggestive of proximity,[15] the remaining statements in the email eliminate that possibility. The phrase "[g]ive her a break in response for full testimony" suggests that the Government was considering exercising its prosecutorial discretion to not prosecute a putative defendant for criminal

---

[14] While this opinion focuses on whether the Government's representation to Drake that she was not a target, Drake's proximity to the scheme is indicative that, at the very least, she was a subject. See Dep't of Justice, U.S. Attorneys' Manual § 9-11.151 (defining "subject" as "a person whose conduct is within the scope of the grand jury's investigation"). Nonetheless, the Government also represented to Drake that she was not a subject.

[15] This court is not convinced that statement is suggestive of mere proximity. IRS Special Agent Blackerby testified that the "Five Guys system" was the name investigators assigned to Harrison and the nominee lending schemes prosecuted here. (Tr. of Mar. 7, 2018 Hr'g (Doc. 248) at 66.) Taken literally, the prosecutor's statement that Drake was an "essential cog" in the Five Guys system suggests the Government had developed a firm opinion as to Drake's role in the bank fraud scheme in 2013.

activity in exchange for full and truthful testimony. The following phrase, "make her eat a false entry on bank books charge," suggests the Government had evidence of wrongdoing that would support a guilty plea.[16] Special Agent Blackerby understood that phrase to ask whether the Government should charge Drake and have her enter a plea of guilty to a criminal offense. (Tr. of Mar. 7, 2018 Hr'g (Doc. 248) at 67.) It is fundamental that the entry of a plea of guilty requires a determination by a court that there is an independent factual basis for the guilty plea. See Fed. R. Crim. P. 11(b)(3); United States v. Mitchell, 104 F.3d 649, 652 (4th Cir. 1997) (referring to requisite factual basis under former Rule 11(f) and stating that a court "need only be subjectively satisfied that there is a sufficient factual basis for a conclusion that the defendant committed all of the elements of the offense"). Therefore, the suggestion by a prosecutor that one viable alternative is the compulsion of a guilty plea by Drake reflects something more than Drake's "mere proximity to an unlawful scheme." It suggests the Government

---

[16] Within the context of the email, the offer of a false entry plea follows a description of Drake's status as "an essential cog in the Five Guys system" and further suggests to this court that the false entry charge may have been a lesser offense than the one the Government had evidence to prosecute as to Drake.

"has substantial evidence linking Drake to the commission of a crime, and who, in the judgment of the prosecutor, is a putative defendant." <u>See</u> Dep't of Justice, <u>U.S. Attorneys' Manual</u> § 9-11.151.

Second, the Government argues that the email is "privileged and would ordinarily not be subject to discovery under Fed. R. Crim. P. 16(a)(2)." (Government's Opp'n Br. (Doc. 233) at 16 & n.8.) This court agrees, and this court did not order the disclosure of this email. Instead, it was turned over voluntarily by prosecutors to defense counsel because of its possible appearance in light of contrary representations in briefs filed with this court. (<u>Id.</u>) This court agrees that this email was appropriately disclosed in light of the representations made to the court in the Government's brief, which contains at least one statement that appears contrary to the information contained in the email. (<u>See</u> Government's Resp. to Def. Shannon Drake's Mot. to Dismiss and Suppress Grand Jury Test. ("Government's Resp.") (Doc. 178) at 2.) Furthermore, the Government's voluntary disclosure of that email constitutes a waiver of that privilege with respect to the information contained in the email. <u>See</u> <u>United States v. Jones</u>, 696 F.2d 1069, 1072 (4th Cir. 1982). Notably in this case, the Government

has chosen not to present any further evidence which might permit this court to find those facts as argued in its brief, (Government's Opp'n Br. (Doc. 233)), that is, that this email is simply a reflection of an ongoing process in which the prosecutors and law enforcement agents were debating who should or should not be designated as a target in an investigation, (id. at 16-17). While this court accepts that there may ordinarily be some discussions about target status among law enforcement and prosecutors, the email clearly communicates the Government's firm opinion as to wrongdoing by Drake and its consideration of her as a putative defendant. Absent some evidence to the contrary, this court is not able to find this email to reflect a nominal debate by investigators as to Drake's status. Finally, and notably, the DOJ's definition of target refers to the "prosecutor or Grand Jury" and makes no reference to law enforcement personnel making that decision.

Third, this court agrees with the Government that, in response to the email, "[a]t the hearing held on March 7, 2018, Agent Blackerby testified that she did not recall the email or recall having a conversation on that topic at that time." (Government's Opp'n Br. (Doc. 233) at 17 (citing Excerpt of Tr. of Mar. 7, 2018 Hr'g (Doc. 226) at 20-22).) However, that

testimony, which this court credits, does not diminish the significance of the statements in the email. This court cannot find, as the Government argues, that the prosecutor's email reflects merely a point of discussion as to the "consideration and re-consideration of targets" during an investigation. (Government's Opp'n Br. (Doc. 233) at 16.) The only email recipient to testify at the hearings does not recall any such discussion. The two alternatives proposed by the prosecutor in the email for discussion both suggest some evidence of wrongdoing, at least sufficient to support either a guilty plea or an agreement whereby the Government exercises its discretion to not prosecute in exchange for full testimony. To find the statements contained in the email are simply a prelude to a general discussion of the case would require some reasonable inference that the Government might require an individual "to eat a false entry on record keeping" without some evidence known to the Government to support that particular option. That a prosecutor would threaten to compel a guilty plea without evidence to support that threat is an untenable position.

Fourth, the Government contends the evidence supporting Drake's role in the scheme did not become clear until Y.S. and C.G. testified before the Grand Jury in 2016. (Government's

Opp'n Br. (Doc. 233) at 5-6.) Notably, the Government points out, it was during their testimony in 2016 that the Government learned things such as "Drake had the primary duty to handle the factoring accounts associated with Harrison[,]" (id. at 6), and that "Corriher and Drake were lending clients (straw companies controlled by Harrison) new money to pay old, unpaid debt . . . [,]" (id.). However, the argument that Drake's role was not discovered until 2016 is at least somewhat belied by the prosecutor's statement in 2013 that Drake "was an essential cog in the Five Guys system and was well aware that these loans were a nominee arrangement." (See Tr. of Mar. 7, 2018 Hr'g (Doc. 248), Ex. 3, May 5, 2013 email.) It appears to this court that Drake was targeted at least as having committed criminal recordkeeping violations in 2013, and those charges were later abandoned in favor of the more serious offenses presently charged. In the absence of the presentation of any evidence to refute the prosecutor's statements that Drake was "an essential cog in the Five Guys system" and could be compelled to "eat a guilty plea," this court declines to find that Drake's criminal activity was not known until 2016. Drake's testimony in 2013 makes it clear that that Government was well aware at that time

of Drake's relationship to Corriher and her work at the Bank in relation to the five companies at issue in this case.

This court has considered the evidence, reasonable inferences from the evidence, and the specific language of the email. This court finds that Drake was not formally identified by the United States as a target of its bank fraud investigation until 2016, nor was the United States under any constitutional or statutory duty to formally classify her as a target. However, this court further finds that by May 2013 Drake was a person about whom the prosecutor had substantial evidence linking her to the commission of a crime, and who, in the judgment of the prosecutor, was a putative defendant as to a bank recordkeeping felony. The Government's advice to Drake and her counsel that she was neither a target nor a subject of the investigation, but was called to testify merely as a fact witness, was misleading to Drake and her counsel. When the Government affirmatively represented to Drake and her counsel that her status stood as "not a target of this investigation," that statement was inconsistent with statements the prosecutor was making privately to co-counsel and law enforcement officers. It also appears to have been inconsistent with not only the evidence available to

the Government at that time but also its intentions with respect to Drake.

Not only was that advice misleading, but also those misleading statements have now affected all stages of this proceeding. First, and perhaps most significantly, the Government's advice was sufficiently misleading to deprive both Drake and her counsel of a reasonable opportunity to address a conflict of interest as a result of Smith Moore's joint representation of Drake and the Bank and in light of any criminal conduct by Drake. In a situation where the prosecutor either declines to comment on a witness's target status or notifies a witness of their target status, defense counsel considers the prosecutor's silence or statement and advises the client accordingly. In either situation, counsel here it appears would have advised Drake to invoke her Fifth Amendment privilege or to seek separate counsel. On the other hand, where a witness's target status is misrepresented, defense counsel is prevented from intelligently rendering such advice.

Smith Moore had already directed the acquisition of separate counsel for Doug Corriher, an individual identified as a target of the investigation. (Tr. of Nov. 9, 2017 Hr'g (Doc. 135) at 173.) Drake was deprived of this opportunity. As

explained by Petersen in his testimony at the November 9, 2017

hearing:

> My practice over the years has been if I'm
> representing the corporation, the way I communicate
> with a corporation is through a corporate officer. So
> if there is a grand jury subpoena for documents to a
> hypothetical corporation, the only way I have to
> communicate with the corporation about fulfilling that
> production obligation is communicating through a
> person on behalf of the entity.
>
> In doing that, if hypothetically Mr. Chut was
> involved, I would call Mr. Chut and say what's going
> on at this stage of this case as you perceive it? Mr.
> Chut might or might not tell me that my client, the
> corporation, was a target or a subject. He might not.
> But I would understand if Mr. Chut told me your
> client, the entity, is not a subject or a target. I
> understand fully that Mr. Chut could change his mind
> hypothetically the next day.
>
> . . . .
>
> So I would also ask him the same question about
> the person conduit with whom I was communicating to
> the entity. If he told me that's a bad person in my
> mind, I would get that person separate counsel right
> then. If he told me we don't think that person is a
> bad person at this moment, I would proceed in helping
> that person get ready to go to the grand jury to give
> the documents and to answer[] questions.

(Tr. of Nov. 9, 2017 Hr'g (Doc. 135) at 204-05.) Petersen's

testimony on this topic illustrates how defense counsel relies

on a prosecutor's statements in assessing conflicts of interests

during representation of a witness before the grand jury.

More specifically as to this conflict of interest issue and as the Government notes, it appears there were discussions between Drake's counsel and the prosecutor with regard to Smith Moore's joint representation of the Bank and Drake. As the Government details in its brief, quoting a Smith Moore attorney's notes from a May 23, 2013 meeting:

> The AUSA raised the concern that it "appears Ms. Drake [was] involved in that situation." Later in the conversation, the notes indicate a reference by the AUSA to "millions of $'s in collections . . . 90 days in arrears." Attorney Medford then indicated that "all of these entities made peace that satisfied them." The AUSA is then noted as telling the [Smith Moore] lawyers that "you guys represent the bank & not individual . . . at some point – you guys don't represent her directly." The notes show Attorney Medford responding: "We've looked carefully – her role – what she knows . . . no problem . . . Think you [have] misread her involvement . . . You're wrong about what she has." The AUSA is noted as saying on the government's part, "Not having [an] opinion . . . [but merely] raising issue" and urging Attorney Medford, "If it comes up . . . be up front." Attorney Medford is noted to have reassured the AUSA: "We [have] looked at this . . . our conclusions . . . if we found something out."

(Government's Opp'n Br. (Doc. 233) at 8-10 (citing Government's Opp'n Br., Ex. 4, Dildine May 23, 2013 Notes (Doc. 244-4) at 1-5).)

As noted earlier, the notes quoted in the Government's brief are not entirely clear. While they reflect the prosecutor stating that Medford and Smith Moore represented the Bank and

not Drake individually, this is contrary to correspondence sent
to the same prosecutor by Ashley. (Tr. of Mar. 7, 2018 Hr'g
(Doc. 248), Ex. 5, September 18, 2012 Letter from Bruce Ashley.)
This court interprets Medford's statement "no problem" as
reflected in the notes as most likely referring to a potential
conflict.

The Government, interpreting the notes in a slightly
different manner, argued at the April 13, 2018 hearing that the
prosecutor made his concerns known to Medford and that the two
of them discussed whether Drake needed her own counsel.[17] (Tr. of

---

[17] The Government originally contended that Drake was not a
target in 2013. (Government's Resp. (Doc. 178) at 2.) This
contention is now undermined by disclosure of the May 5, 2013
email. Following this disclosure, the Government has more
recently contended that the May 5, 2013 email reflected
discussions among the investigatory team, (Government's Opp'n
Br. (Doc. 233) at 16-17), although no one seems to recall any
discussions of that type, (see Tr. of Mar. 7, 2018 Hr'g (Doc.
248) at 68 (Blackerby testimony); Tr. of Apr. 13, 2018 Hr'g
(Doc. 251) at 67 (Chut testimony)). Finally, the prosecutor
contends that he disclosed concerns regarding Drake to Medford
during a May 23, 2013 meeting, as reflected in notes cited by
the Government in its brief. (Tr. of Apr. 13, 2018 Hr'g (Doc.
251) at 65-67; Government's Opp'n Br. (Doc. 233) at 8-10.)
(Footnote continued on next page)

Apr. 13, 2018 Hr'g (Doc. 251) at 65.) The prosecutor contends

that after being assured by Drake's counsel, who from the

prosecutor's perspective at the time was <u>solely</u> the Bank's

counsel, that Drake was okay, the Government proceeded ahead

with Drake as a fact witness. (<u>Id.</u>; Government's Opp'n Br., Ex.

4, Dildine May 23, 2013 Notes (Doc. 244-4) at 5 ("Chut – You

guys rep[resent] bank [and] not individual. At some point – you

guys don't rep[resent] her directly.").) The prosecutor argued

---

    The court has, in light of this, reviewed other notes from
this time period which were disclosed for in camera review. The
court has not relied on these notes in reaching its decision
because the Government has not seen these notes. While there may
be some support in these related notes for discussions occurring
regarding the prosecutor's concerns about Drake, it is not clear
from reviewing these notes what those concerns were or what
might have been disclosed. Those notes could be interpreted to
suggest discussions over a potential conflict, concerns over
Drake's criminal responsibility, or concerns over whether Drake
had testified or would testify truthfully before the Grand Jury.
This case has been aggressively litigated and this court has
considered whether the Government should be provided access to
these other notes in light of its current arguments, as it
appears Drake has waived her privilege as to this particular
work product. However, in light of the Government's shifting
positions, as outlined above, and in the absence of any notes or
evidence from the Government as to what occurred during meetings
between defense counsel and prosecutors from May 23 to May 28,
2013, this court does not find any further argument as to
interpretation of these notes helpful or appropriate. At
present, the evidence stands that, regardless of what might have
been discussed during that time frame, neither Dildine nor
Peterson nor Drake understood Drake to have been a target or
subject of the Government's investigation.

that he was entitled to rely on the Bank's counsel's opinion on this matter. (Tr. of Apr. 13, 2018 Hr'g (Doc. 251) at 65-66 ("I discussed with Mr. Medford, as indicated in the notes, that I was concerned about her, and I was assured by Mr. Medford that I was wrong and that she was not factually involved. . . . Based on that, we proceeded forward.").)

This court is not persuaded by the Government's allegations. First, as noted previously, the Government has neither filed an affidavit nor presented any evidence to support those allegations, particularly as to the conclusion that the prosecutor may have relied upon Medford's representation.

Second, this court does not find the prosecutor's alleged reliance on the Bank's counsel's representations compelling. The prosecutor appears to have understood Medford to be the Bank's attorney, not Drake's. The prosecutor necessarily understood then, that Medford's duty was to the Bank, not Drake, and that any representation that Drake was "okay" was within these parameters. It seems to this court that a reassurance from the Bank's attorney, made to a prosecutor holding evidence sufficient in his opinion to support a guilty plea (based on this court's reading of the May 5, 2013 email) is insufficient to remedy any initial concern the prosecutor might have had.

Third, the position taken by the prosecutor at the April 13, 2018 hearing, that he relied on Medford's representations as to Drake's criminal liability in 2013 despite having concerns of his own, is inconsistent with the position taken by the Government in its brief. (See Government's Opp'n Br. (Doc. 233) at 4-7 (arguing that Drake's role in the Five Guys scheme was not revealed until the 2015 and 2016 Grand Jury testimony of C.G. and Y.S. and after years of investigatory work).) More specifically, in his initial response to this court, the prosecutor stated that "three years prior to her indictment, the defendant was not a subject or target of the investigation." (Government's Resp. (Doc. 178) at 2.) If, as the prosecutor contends, he did have concerns about Drake but relied solely upon Medford's assurance to drop those concerns, in his initial response to this court, the prosecutor should have explained the full circumstances of his early understanding of Drake's liability. Instead, the prosecutor, after the fact, has pointed to later discovery of information as an explanation for Drake not being advised that she was a target or at least a subject in 2013.

Nonetheless, the notes from that meeting reflect the prosecutor stating he does "not hav[e] an opinion," suggesting

the prosecutor declined to take a position on whether Drake was in need of separate counsel. If, as it appears from the May 5, 2013 email, the Government had evidence of Drake's criminal activity, relying upon an opinion of the Bank's counsel that things were "okay" is not compelling. Furthermore, even if it were reasonable for a prosecutor to rely on defense counsel's assessment of criminal liability, it is unclear how Medford's assurances as to the "3.2 million dollar loan" would have exonerated Drake from criminal liability for the known recordkeeping violations.

Third, if, as the Government alleges, based upon the Bank's counsel's representation, the prosecutor decided to call Drake as a "witness" before the Grand Jury, then it is entirely unclear whether that means the Government decided to "give Drake a pass in exchange for her testimony," exercise its discretion not to prosecute Drake, or something else entirely. During the April 13, 2018 hearing, the prosecutor repeatedly stated that he chose to call Drake before the Grand Jury as a "witness," which does not directly answer the question here, and does not mean that Drake was neither a subject nor a target. The term "witness" is not defined by the DOJ, but even its common

understanding would suggest something different from a "target" or a "subject."

Considering a second manner in which this statement was misleading, it appears to this court that advising a witness before the Grand Jury that the witness is neither a target nor a subject of the investigation, but is called as a fact witness, is misleading to the Grand Jurors. The absence of target or subject notification is reasonably suggestive to the Grand Jury that the Government has no evidence of wrongdoing by the witness. A "fact witness" characterization eliminates any of the inherent bias or credibility concerns that might be present if a subject or target were to testify. The Government's representation also allowed it to present to the Grand Jury the testimony of Drake as a fact witness in the investigation of Doug Corriher while at the same time avoiding any potential complexity of Drake seeking new counsel or invoking her Fifth Amendment privilege had the Government simply remained silent as to Drake's status.

Third, the Government's misrepresentation was presented to this court. On January 12, 2018, the Government stated the following to this court in response to a motion filed by Defendant Drake:

> The defendant twice testified before the grand jury in this case, on September 25, 2012, and May 29, 2013. She was eventually charged <u>three years</u> after she last testified before the grand jury. In her Motion to Dismiss, the defendant insists the government misled the defendant as to her status as a subject or target of the investigation at the time of her testimony. <u>This assertion is incorrect because, three years prior to her indictment, the defendant was not a subject or target of the investigation.</u>

(Government's Resp. (Doc. 178) at 2 (second emphasis added).)

This court does not find that Drake was formally designated as a target of a Grand Jury investigation as might be associated with a formal internal process. (<u>See, e.g.</u>, Government's Resp. to Def. Ronald Earnest's Mot. to Dismiss and Request for <u>Kastigar</u> Hr'g, Ex. 1, Decl. of Miguel Rivera (Doc. 181-1).) However, that response neglects to add that three years prior to her indictment, the Government had sufficient evidence to suggest that Drake had engaged in criminal wrongdoing and was a potential putative defendant in this court. As stressed previously, "the test as to whether a witness is a target of a grand jury investigation cannot be whether he 'necessarily' will be indicted, but whether according to an objective standard he could be indicted." <u>Crocker</u>, 568 F.2d at 1054; <u>see also</u> Dep't of Justice, <u>U.S. Attorney's Manual</u> § 9-11.151. Perhaps, at the time of Drake's Grand Jury testimony, the Government may have been focused on investigating and indicting Corriher. Despite

learning extensively about Drake's role at the Bank and forming
an opinion as to her criminal liability, the fact that Corriher
was the target does not permit the provision of misleading
statements by the prosecutor. Even if a grand jury witness is
not a target solely by exercise of prosecutorial discretion, a
statement that the witness is neither a target nor a subject but
only a witness has a significant capacity to mislead as to the
Government's knowledge and possible future consequences.

This court is unable to find any way to rationalize a
statement in a brief to this court that Drake was neither a
target nor a subject of an investigation in 2013 while at that
same time the Government was discussing whether to require Drake
to either cooperate in exchange for a break or "eat a guilty
plea" to a low level recordkeeping violation absent the
presentation of some evidence to contradict the reasonable
inferences to be drawn from the email.

### C.    **What Action or Remedy is Appropriate in Light of the Government's Conduct?**

Defendant argues that the Government's misleading
statements to Drake and her counsel rise to the level of a
constitutional violation, and for that reason, this case may be
dismissed. Although this court believes the misleading nature of
the prosecutor's statements to Drake and her counsel are

relatively easily identified, the determination of what right, if any, was violated and whether this court should take action is not as clear. This court considers whether a remedy in this case is justified by either (1) this court's supervisory powers and/or (2) a constitutional violation.

### 1.    This Court's Supervisory Powers with Respect to Grand Jury Proceedings

In <u>Bank of Nova Scotia v. United States</u>, 487 U.S. 250 (1988), the Supreme Court prohibited a court's supervisory powers from being used as a means to circumvent Federal Rule of Criminal Procedure 52(a)'s requirement of disregarding harmless error. Rule 52(a) provides that "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Fed. R. Crim. P. 52(a); <u>accord</u> <u>United States v. Mills</u>, 995 F.2d 480, 487 (4th Cir. 1993). <u>United States v. Williams</u>, 504 U.S. 36 (1992), provided further clarification on <u>Bank of Nova Scotia</u>'s holding. In <u>Williams</u>, the Tenth Circuit had affirmed the district court's dismissal of an indictment where the Government had failed to disclose exculpatory evidence to the grand jury as required by prior Tenth Circuit case law. 504 U.S. at 39. The respondent argued that this dismissal was authorized by the court's "supervisory

power." Id. at 46. Reversing the Tenth Circuit, the Court

stated:

> Bank of Nova Scotia makes clear that the supervisory
> power can be used to dismiss an indictment because of
> misconduct before the grand jury, at least where that
> misconduct amounts to a violation of one of those
> "few, clear rules which were carefully drafted and
> approved by this Court and by Congress to ensure the
> integrity of the grand jury's functions[.]"

Id. at 46 (citations omitted). The Court went on to state:

> We did not hold in Bank of Nova Scotia, however,
> that the courts' supervisory power could be used, not
> merely as a means of enforcing or vindicating legally
> compelled standards of prosecutorial conduct before
> the grand jury, but as a means of prescribing those
> standards of prosecutorial conduct in the first
> instance — just as it may be used as a means of
> establishing standards of prosecutorial conduct before
> the courts themselves. It is this latter exercise that
> respondent demands. Because the grand jury is an
> institution separate from the courts, over whose
> functioning the courts do not preside, we think it
> clear that, as a general matter at least, no such
> "supervisory" judicial authority exists, and that the
> disclosure rule applied here exceeded the Tenth
> Circuit's authority.

Id. at 46-47. The Fourth Circuit has echoed this prohibition

against the use of supervisory powers to prescribe prosecutorial

standards before the grand jury outside of instances of

constitutional or statutory violations. See United States v.

Burns, 990 F.2d 1426, 1436 (4th Cir. 1993); Mills, 995 F.2d at

487; United States v. Outlaw, 464 F. App'x 165, 167 (4th Cir.

2012).

Absent a constitutional or statutory violation that prejudiced Drake, this court lacks supervisory authority to remedy the misrepresentations in question. Accordingly, this court continues to consider whether such a violation has occurred in this case.

## 2.   **Alleged Constitutional Violations**

The Sixth Amendment right to counsel attaches only after judicial proceedings have been initiated against a defendant.[18] See Moran v. Burbine, 475 U.S. 412, 428 (1986) (stating that the right to counsel attaches after the first formal charging proceeding); United States v. Ayala, 601 F.3d 256, 272 (4th Cir. 2010) (finding that a defendant's Sixth Amendment right does not attach before the Grand Jury). As a result, any misleading statements by the Government could not violate a constitutional

---

[18] During the course of the April 13, 2018 hearing, this court raised its concerns with the obvious conflict between the Government's briefs arguing that the Sixth Amendment does not apply to a witness before a grand jury, (United States' Opp'n. to Def. Shannon Drake's Mot. to Dismiss the Indictment ("Government's Opp'n Br.") (Doc. 233) at 26), and the prosecutor's advice to grand jury witnesses that under the Sixth Amendment they had a right to counsel at that time, (see, e.g., Government's Opp'n Br., Ex. 1, C.G. Dec. 14, 2015 Grand Jury Test. (Doc. 233-1) at 5). During argument, counsel for the Government argued that the advice to grand jury witnesses was appropriate because of this court's practice under the Criminal Justice Act ("CJA") Plan to appoint counsel for a grand jury witness who requests it.
(Footnote continued on next page)

right that had not attached at the time of Drake's Grand Jury

testimony.[19]

The Fifth Amendment, if violated, does not require

dismissal of an otherwise valid indictment:

> The grand jury's sources of information are
> widely drawn, and the validity of an indictment is not
> affected by the character of the evidence considered.
> Thus, an indictment valid on its face is not subject
> to challenge on the ground that the grand jury acted

---

As a preliminary matter, this court disagrees that any
witness called to appear before the grand jury has a right to
counsel under this court's practices, the CJA Plan, or anything
else. Regardless, to confuse the Sixth Amendment and the CJA
Plan in rendering advice of rights to a witness is troubling.
The Sixth Amendment and the CJA Plan are not coextensive, and
advising a witness that they have a Sixth Amendment right is
incorrect and at best a bad practice on the part of the
prosecutor. While the Sixth Amendment is not substantively at
issue in this case, as it does not attach at the grand jury
stage of criminal proceedings, evaluating the evidence and
determining what can and cannot be relied upon is at issue, and
this type of practice does affect this court's assessment of the
reliability of the evidence.

[19] Drake does not directly raise arguments as to a violation
of the Sixth Amendment, (see generally Drake Suppl. Mem. (Doc.
224)), while Earnest does, (see generally Def. Earnest's Mem. in
Supp. of Mot. to Dismiss Indictment or in the Alternative
Suppress his Grand Jury Test. for Sixth Amendment Violations and
Request for Kastigar Hr'g (Doc. 149)). Nonetheless, because
Drake's supplemental briefing touches on issues of compromised
representation by counsel, Sixth Amendment violations are
addressed by this order as well.

At the April 13, 2018 hearing, Drake's counsel argued that
the Government interfered with Drake's attorney-client
relationship in violation of due process. Due process arguments
are addressed in a subsequent section.

on the basis of inadequate or incompetent evidence,
<u>Costello v. United States</u>, <u>supra</u>; <u>Holt v. United</u>
<u>States</u>, 218 U.S. 245, 31 S. Ct. 2, 54 L.Ed. 1021
(1910); or even on the basis of information obtained
in violation of a defendant's Fifth Amendment
privilege against self-incrimination, <u>Lawn v. United</u>
<u>States</u>, 355 U.S. 339, 78 S. Ct. 311, 2 L.Ed. 2d 321
(1958).

<u>United States v. Calandra</u>, 414 U.S. 338, 344-45 (1974); <u>see also</u>

<u>United States v. Blue</u>, 384 U.S. 251, 255 & n.3 (1966). However,

as discussed above, if a constitutional violation is found to

have occurred and to have prejudiced the defendant, the court

may invoke its limited supervisory powers over grand jury

proceedings. <u>Williams</u>, 504 U.S. at 46-47. Thus, this court will

consider whether a Fifth Amendment violation has occurred in

this case sufficient to permit it to exercise its supervisory

powers.

The Fifth Amendment privilege applies to grand jury

proceedings but requires assertion by the individual:

> [T]he Fifth Amendment privilege against self-
> incrimination extends to grand jury proceedings.
> Indeed, "the privilege against self-incrimination can
> be asserted 'in any proceeding, civil or criminal,
> administrative or judicial, investigatory or
> adjudicatory.'" Nonetheless, the privilege is normally
> not self-executing. As the Court stated in <u>Minnesota</u>
> <u>v. Murphy</u>, "a witness confronted with questions that
> the government should reasonably expect to elicit
> incriminating evidence ordinarily must assert the
> privilege rather than answer if he desires not to
> incriminate himself."

<u>United States v. Myers</u>, 123 F.3d 350, 359 (6th Cir. 1997)

(citations omitted). In this case, even though <u>Miranda</u>-type

warnings do not appear to be required in the grand jury setting,

<u>see</u> <u>United States v. Mandujano</u>, 425 U.S. 564, 578-79 (1976)

(plurality op.); <u>United States v. Torcasio</u>, 959 F.2d 503, 507

(4th Cir. 1992), <u>abrogation on other grounds recognized</u> by

<u>United States v. Hairston</u>, 46 F.3d 361 (4th Cir. 1995), Drake

was warned of her privilege against self-incrimination and chose

not to exercise that privilege while represented by counsel,

(Government's Consolidated Resp., Drake Sept. 25, 2012 Grand

Jury Test. (Doc. 62-1) at 4; Government's Consolidated Resp.,

Ex. 2, Drake May 29, 2013 Grand Jury Test. (Doc. 62-2) at 3).

Furthermore, "the failure of [a] witness to understand the

privilege against self-incrimination will not require the

subsequent suppression of the witness's concededly false

statements." <u>United States v. Babb</u>, 807 F.2d 272, 276-77 (1st

Cir. 1986) (citing <u>United States v. Wong</u>, 431 U.S. 174, 177-79

(1977)).

Moreover, as discussed above, courts have consistently held

that the failure to provide target warnings to a grand jury

witness is not a matter of constitutional concern. <u>See</u>

<u>Washington</u>, 431 U.S. at 189; <u>Crocker</u>, 568 F.2d at 1055-56.

Nevertheless, it appears the courts prefer that target warnings be given. See United States v. Pacheco-Ortiz, 889 F.2d 301, 310 (1st Cir. 1989); Crocker, 568 F.2d at 1049. As emphasized above, this case is not one in which the Government refrained from giving a target warning but instead one where the Government, for whatever reason, gave inaccurate and misleading information with respect to a Grand Jury witness's status.

Accordingly, the narrow question before the court is whether an inaccurate and misleading representation as to an individual's status on which that individual relies and allows to induce her into waiving her Fifth Amendment right and testify before the grand jury amounts to a violation of the Fifth Amendment. Drake points to two cases of note in support of her position.

First, Griffin v. California, 380 U.S. 609 (1965), considered a state criminal jury trial in which the prosecutor made a comment about the defendant's choice to not testify. Id. at 611. Here the Supreme Court stated that the prosecutor's comment on the defendant's choice to exercise the privilege "cut[] down on the privilege by making its assertion costly." Id. at 614. Drake contends that her position is similar in that she was deterred from invoking the Fifth Amendment by the

Government's acts which "misle[d] her and Smith Moore about whether it was applicable." (Drake Suppl. Mem. (Doc. 224) at 4.)

Second, Drake likens her situation to <u>Bumper v. North Carolina</u>, 391 U.S. 543 (1968), where the Supreme Court held that an individual who is told by law enforcement that there is a warrant to search a home cannot be deemed to have consented to said search. <u>Id.</u> at 548-50. The Court reasoned that "[w]hen a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent." <u>Id.</u> at 550. Drake contends that "when the Government assured [her] and her attorney she was not a subject or target despite being the account executive for the Nominee Company accounts, they announced in effect that Ms. Drake was not considered liable for what Corriher had done and thus has no right to refuse answering questions based on the Fifth Amendment." (Drake Suppl. Mem. (Doc. 224) at n.2.)

This court finds a few additional cases instructive on this question. First, <u>United States v. Babb</u>, 807 F.2d 272 (1st Cir. 1986), addresses an instance where a prosecutor falsely assured a grand jury witness moments before his testimony that he was

neither a target nor a subject. _Id._ at 274. Unlike the case at

hand, the defendant in _Babb_ went on to commit perjury. _Id._ at

275. Like this court, the First Circuit in _Babb_ acknowledged

that, while the Fifth Amendment applies to proceedings before

the grand jury, the Supreme Court had not addressed what should

occur when a misleading warning is given. _See_ _id._ at 277.

Stopping short of answering whether a defendant who is misled

and induced into waiving his Fifth Amendment privilege has

suffered a constitutional violation, the First Circuit hinged

its reasoning on the fact that the defendant before it had

committed perjury, stating "the commission of perjury does not

fall within the protection afforded compelled self-incriminating

statements." _Id._ at 277.

Second, _United States v. Winter_, 663 F.2d 1120 (1st Cir.

1981), _abrogated on other grounds_ by _Salinas v. United States_,

522 U.S. 52 (1997), is another case in which a prosecutor made

misrepresentations regarding a grand jury witness's target

status. _Id._ at 1150-51. In _Winter_, the defendant raised a due

process claim and the First Circuit conducted a totality of the

circumstances inquiry to determine whether the

misrepresentations had actually misled the witness. _Id._ at 1151.

The court declined to believe that the defendant "could possibly

have been misled into waiving his rights" where, despite "subject" not being specifically used, the circumstances of the investigation and how the defendant's name had come up during the course of the investigation were explained to him. Id. at 1152. The court ultimately found no relationship between the misconduct and the harm of which the defendant complained and concluded that his due process claim was "tenuous indeed." Id.

Third, in United States v. Crocker, 568 F.2d 1049 (3d Cir. 1977), the Third Circuit addressed an issue somewhat similar to that presented in this case. The defendant was convicted of knowingly making false declarations before a grand jury in violation of 18 U.S.C. § 1623. Id. at 1050. That defendant contended the indictment should have been dismissed because the prosecutor misled his attorney by representing that the defendant was not a target although he was in fact a target. Id. at 1053. The defendant's counsel did not practice criminal law and, before the defendant's first appearance, counsel advised the prosecutor that if the defendant was a target, counsel wished to arrange retention of a criminal lawyer. Id. Before the second grand jury appearance, counsel again inquired and was told the defendant's status had not changed, although the government had in its possession at that time statements that

indicated the defendant had given false statements to the grand jury. Id.

The Third Circuit first rejected as "disingenuous" an argument by the Government that the defendant was not a target of the grand jury investigation when he appeared and testified for the second time before the grand jury. Id. at 1054. Notably, the court stated, "the test as to whether a witness is a target of a grand jury investigation cannot be whether he 'necessarily' will be indicted, but whether according to an objective standard he could be indicted." Id. It appeared that, at the time of the second grand jury appearance, the government "had information suggesting [the defendant] lied in his first grand jury appearance . . . ." Id.

The Third Circuit expressed concern over the conduct of the government. The court agreed with the defendant that this was an instance "in which the United States Attorney, in response to a specific inquiry as to the defendant's status, gave a misleading answer" and, as a result, found "that aspect of the case [to be] quite troublesome." Id. at 1055. However, after reviewing a number of relevant cases, the Third Circuit found that

> in view of the warnings actually given and of
> Crocker's knowledge of the subject of the grand jury's
> general investigation, we decline to hold that his
> testimony before the grand jury . . . should be

> suppressed and the indictment dismissed because,
> although his attorney inquired, he was not warned that
> he was a target of the grand jury's investigation.
>
> Nor, on this record, are we prepared to hold that
> the grand jury testimony should be suppressed and the
> indictment dismissed because Romano misled Crocker's
> attorney.

Id. at 1056.

Fourth, in United States v. Gillespie, 974 F.2d 796 (7th

Cir. 1992), the Seventh Circuit considered an instance where a

grand jury witness was, in contravention of DOJ policy, neither

advised of his Fifth Amendment rights nor provided with a target

warning. Id. at 797-98. The defendant in question was an

experienced businessman who had consulted with counsel prior to

his grand jury testimony and who was provided an Advice of

Rights prior to his testimony. Id. at 797, 800, 804. Citing

Williams, 504 U.S. 36 (1992), and Bank of Nova Scotia, 487 U.S.

250 (1988), the Gillespie court recognized that using

supervisory authority over grand jury proceedings requires "a

constitutional or congressional imperative." 974 F.2d at 800.

Because in that case, the complained of conduct was failure to

warn, the court found that "[t]he prosecutor's failure to

provide Gillespie with target warnings in contravention of the

Department's internal policy is not error of the nature that

calls for the exercise of our supervisory powers." Id. at 801.

The Seventh Circuit indicated, however, that a bad faith failure to warn or an affirmative representation might be a different case. The court stated "[b]ecause, however, there is no indication that the government acted in bad faith in failing to provide the target warnings, or that it proffered an affirmative misrepresentation to [the defendant] regarding his target status, we limit ourselves to verbal admonitions." Id. at 802.

Taken together, these cases result in a few observations. First, Babb and Crocker addressed criminal activity in the context of false statements to a grand jury. However, "[t]he privilege against self-incrimination . . . does not shelter new perjury." United States v. Chevoor, 526 F.2d 178, 181 (1st Cir. 1975), abrogated on other grounds by Brogan v. United States, 522 U.S. 398 (1998); see also Washington, 431 U.S. at 189 & n.1. The conclusion that the Fifth Amendment did not provide a remedy in these cases is unsurprising, however, both opinions belabored the troubling nature of the Government's behavior that allegedly resulted in the defendants' choice to waive their Fifth Amendment rights.

Second, Winter and Gillespie took a step further. The Winter court considered whether the totality of the

circumstances supported a finding that the defendant was in fact misled into waiving his rights. The court seemed to presume that a due process claim was actionable in that case, but that proof of causation was lacking on the facts before it. Likewise, the Gillespie court suggested that use of supervisory powers might be permitted in a case where "the government acted in bad faith in failing to provide the target warnings, or that it proffered an affirmative misrepresentation to [the defendant] regarding his target status[.]" See Gillespie, 974 F.2d at 802. This court is unable to determine from this evidence whether any misleading statements were intentional but does find such statements to be affirmative misrepresentations. This case raises the issue not reached in Gillespie – what should happen when affirmative misrepresentations are made.

Third, considering under a totality of the circumstances approach whether the false statement did in fact mislead Drake to waive her Fifth Amendment rights and testify, Bumper provides a useful analogy. Much like a homeowner presented with an officer claiming to have a warrant, a grand jury witness presented with an affirmative representation that he or she is "merely a fact witness" may rely on such a representation. The advice to Drake and her counsel that she was not a target but

merely a fact witness certainly had the potential to mislead and induce Drake into waiving her Fifth Amendment rights and testifying. As the First Circuit in <u>Babb</u> recognized:

> Even if we assume, for purposes of Babb's contentions, that the prosecutor purposely attempted to mislead Babb, the obvious reason for such misrepresentations would have been to induce Babb to waive his fifth amendment privilege and to give helpful testimony to the grand jury.

<u>Babb</u>, 807 F.2d at 279. Here, Drake testified before the Grand Jury twice in reliance on the AUSA's representations that she was not a target but was merely a fact witness called to testify in the investigation targeting Corriher. Had the Government either correctly informed Drake of her status or simply declined to comment entirely, this court does not doubt that at least Petersen, based on his testimony, would have advised Drake to seek separate counsel, and either Petersen or new counsel may very well have recommended invoking her Fifth Amendment privilege.

Intertwined with the guarantee of due process is a requirement of "fundamental fairness." <u>See, e.g.</u>, <u>Lassiter v. Dep't of Social Servs. of Durham Cty.</u>, 452 U.S. 18, 24-25 (1981). By analogy, considering the doctrine of equitable immunity, the Fourth Circuit has stated "if the promise was made to defendant as alleged and defendant relied upon it in

incriminating himself and others, the government should be held to abide by its terms." United States v. Carter, 454 F.2d 426, 427-28 (4th Cir. 1972). Courts considering doctrines akin to equitable immunity have tied misleading government conduct leading to a defendant's detrimental reliance to due process requirements of fair play. See United States v. Harvey, 848 F.2d 1547, 1555 (11th Cir. 1998) ("When the government by its conduct, here grossly negligent conduct, has created the situation leading to misunderstandings regarding the nature of a plea agreement and the scope of immunity granted, the fair play dictated by due process requires nothing less than that the doubts as to either be resolved in favor of the individual misled." (citation omitted)), vacated by en banc panel on other grounds, 869 F.2d 1439 (11th Cir. 1989).

In this case, allowing the Government to backtrack on affirmative representations made to Drake and her counsel appears to this court to approach contravention of concepts of fundamental fairness ensured by the Fifth Amendment's due process clause. This constitutional question will not be reached by this court, however, because a more fundamental problem prohibits the court from exercising its supervisory powers in this case.

First, during the April 13, 2018 hearing, the Government stated that it does not plan to introduce Drake's Grand Jury testimony at trial. Even if this court were to find that Drake's Fifth Amendment rights were violated in connection with her Grand Jury testimony, this court is not persuaded that such an error prejudices her if the testimony will not be used against her during the Government's case in chief. Because supervisory powers may not be exercised in contravention of Federal Rule of Criminal Procedure 52(a), this court is unable to act where only harmless error exists. See Bank of Nova Scotia, 487 U.S. at 254-55.

Second, considering information that might have been obtained by the Government from Drake's Grand Jury testimony and used to its benefit in other investigatory processes, it is not clear to this court which portions of Drake's testimony might be subject to her Fifth Amendment privilege. While Drake generally alleges that much of her testimony before the Grand Jury was incriminating, not all testimony implicates a defendant's Fifth Amendment privilege. Ohio v. Reiner, 523 U.S. 17, 20-21 (2001). Only answers that "would furnish a link in the chain of evidence needed to prosecute the claimant" cannot be compelled under this privilege. Id. Because the Government is not using Drake's

testimony in its case in chief, it is not clear what evidence might otherwise be incriminating so as to provide a "link in the chain" as to subsequent investigation. For this reason, this court is unable to conclude that any constitutional violation which might have occurred in this case would amount to more than harmless error under Rule 52(a).

Third, and perhaps most significantly, this court cannot find from the evidence presented that legal harm was caused to Drake. It is clear that Petersen, had he been aware of Drake's potential status, would likely have advised her to seek independent counsel. Nevertheless, in the absence of a Sixth Amendment right attaching at the grand jury stage, there is no corresponding constitutional right to conflict-free counsel. See Moran, 475 U.S. at 428; Ayala, 601 F.3d at 272. Furthermore, Drake alleges generally that Smith Moore "provided advice and information regarding [her] testimony before the grand jury." (Tr. of Feb. 8, 2018 Hr'g (Doc. 212), Ex. 3, Drake Aff., ¶ 5.) However, Drake never explains how any misleading information from the prosecutor misled her into waiving her Fifth Amendment privilege. Nor does she explain how the misleading advice affected her discussions with Medford and any advice she may have received. In other words, this court is unable to say that

any advice Medford rendered or that any decision Drake made to testify following that advice was adversely affected by the prosecutor's statements. This is particularly significant in light of the fact that nothing would preclude a prosecutor from reconsidering her status, accurately stated, at a later time. Therefore, while there was misleading conduct, there is no evidence of harmful error as required by Federal Rule of Criminal Procedure 52(a).

The court is very concerned with what occurred in this case, namely with the prosecutor's comments made to Drake, defense counsel, the Grand Jury, and this court. However, in the absence of a constitutional violation mandating a remedy, Calandra, 414 U.S. at 344-45, or a constitutional violation sufficiently prejudicing the defendant to justify use of this court's supervisory powers, Williams, 504 U.S. at 46-47, this court is unable to act. Accordingly, both of Drake's motions seeking dismissal of the indictment or suppression of her Grand Jury testimony will be denied. [20]

---

[20] As indicated previously, this court is not impressed with a brief, (Government's Resp. (Doc. 178)), presented to this court which contended that Drake was not a target in light of the May 5, 2013 email. This court takes that matter under advisement and will consider whether further action is necessary.

### D.   **Motion to Strike**

At the April 13, 2018 hearing, this court overruled Drake's motion to strike with respect to the word count, but indicated that it took under advisement the issue with respect to references to newly proffered facts and additional arguments presented in the Government's responsive brief. This court does not find the proffered facts within the Government's response persuasive nor does it find that the additional arguments add anything new to its analysis of the case. Consequently, Drake's motion to strike will be denied.

## IV.   **CONCLUSION**

For the reasons stated herein,

**IT IS HEREBY ORDERED** that Drake's Motion for Ex Parte Hearing, (Doc. 122 (joining Defendant Earnest's Motion (Doc. 115))), is **DENIED AS MOOT** in light of the procedures put in place by this court.

**IT IS FURTHER ORDERED** that Drake's Motion to Dismiss and Suppress Grand Jury Testimony, (Doc. 163), is **DENIED**.

**IT IS FURTHER ORDERED** that Drake's motion to join Earnest's motion on Fifth Amendment grounds, (Doc. 214), is **DENIED**.

**IT IS FURTHER ORDERED** that Drake's motion to strike the Government's response, (Doc. 235), is **DENIED.**

This court **FINDS** that an attorney-client relationship existed between **DRAKE, MEDFORD,** and **SMITH MOORE** from September 18, 2012, through at least May 29, 2013.

This the 18th day of April, 2018.

_William L. Osteen, Jr._
United States District Judge