# THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### CASE NO: 1:16-CR-205

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> SHANNON MICHELLE DRAKE, <br><br> Defendant. | MEMORANDUM IN SUPPORT OF SHANNON DRAKE'S MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 29 |

COMES NOW Defendant Shannon Michelle Drake, through undersigned counsel, and respectfully moves this Court to enter judgment of acquittal under Federal Rule of Criminal Procedure 29 concerning all charges against Ms. Drake.

## A. Introduction

The Government has presented a lot of evidence, but very little about Ms. Drake. As alleged, there were three groups of factoring loans related to Greg Harrison's staffing business executed in or about 2004, 2008, and 2010 – dubbed Harrison 1.0, 2.0, and 3.0. Various people made decisions about how and whether GrandSouth Bank would approve, execute, and renew those loans, but Ms. Drake was not one of them. Various people made decisions about what if anything to say about those loans on the bank's books or to regulators, but Ms. Drake was not one of them. She and her fellow account executives shared a narrow but busy job to process the factoring lines of credit for a subset of these loans as approved by their supervisor and GrandSouth Bank. There is plenty of evidence that Ms. Drake and the other account executives performed this work as required and in

good faith – not to falsify records or deceive the bank. Thus far, that has been

Ms. Drake's only relevance to this trial.

This Court should enter a judgment of acquittal as to all counts against Ms. Drake because "the evidence is insufficient to sustain a conviction." Fed. R. Crim. Pro. 29(a). "The test for deciding a motion for a judgment of acquittal is whether there is substantial evidence (direct or circumstantial) which, taken in the light most favorable to the prosecution, would warrant a jury finding that the defendant was guilty beyond a reasonable doubt." *United States v. MacCloskey*, 682 F.2d 468, 473 (4th Cir. 1982). The Fourth Circuit has defined "'substantial evidence' as 'evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt.'" *United States v. Smith*, 451 F.3d 209, 216 (4th Cir. 2006) (quoting *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996)). Here, by contrast, the Government's evidence "demonstrates a lack of evidence from which a jury could find guilt beyond a reasonable doubt" regarding Ms. Drake. *Burgos*, 94 F.3d at 862.

### B. The Government Failed to Present Sufficient Evidence that Ms. Drake Knew Enough to Perpetrate the Alleged Crimes

According to the indictment, "[t]he practice of nominee lending is one in which a bank makes loans to a nominal borrower for the benefit of a concealed third party *not included in the loan agreements*" (Doc. No. 85 ¶ 30, emphasis added). Julia Pace testified that so-called "nominee," "straw," or "indirect" loans would be where the actual beneficiary was not included in the "loan documentation," and so the loan officer would need to designate them as "related" to the person's other loans.

2

Case 1:16-cr-00205-WO   Document 470   Filed 01/28/19   Page 2 of 14

The Government has conceded that "[n]ominee or straw loans are not necessarily illegal," but asserted that "[n]ominee loans are illegal where '… the borrower and the bank officer fail to state the real borrower and recipient of the funds, thereby obtaining the loans by means of false pretenses'" (Doc. No. 425 at 7, quoting *United States v. Willis*, 997 F.2d 407, 410 n.2 (8th Cir. 1993)). The Government further clarified that the nominee lending alleged by the indictment was "for the purpose of extending credit to [Greg Harrison]'s staffing business in contravention of the lending limits" of GrandSouth Bank (Doc. No. 425 at 8-9).[1]

Accordingly, to make out their case against Ms. Drake, the Government must prove the following beyond a reasonable doubt with respect to her state of mind:

1. That she knew Mr. Harrison's staffing business to be the true borrower or beneficiary for the Harrison 2.0 factoring loans;

2. That she knew the loan documentation did *not* include Mr. Harrison;

3. That she intended to deceive GrandSouth Bank by concealing Mr. Harrison as the true borrower or beneficiary; and

4. That she knew the purpose of circumventing the bank's lending limits.

The Government failed to introduce evidence to prove the second, third, and fourth points on this list regarding Ms. Drake.

As far as the trial evidence shows, Ms. Drake's knowledge of the Harrison 2.0 accounts was similar to that of Lesley Cannon. Doug Corriher testified that account

---

[1] The Government has also alleged another purpose of avoiding payroll taxes, but Ms. Drake was not charged in Count 28 relating to tax fraud.

executives had been "cross-trained" on each other's accounts, and Ms. Cannon testified

she and Ms. Drake "knew each other's accounts inside and out," including the

Harrison 2.0 accounts. It was common knowledge the Harrison 2.0 accounts were related

to Mr. Harrison's staffing business, and there is no evidence that Ms. Drake, Ms. Cannon,

or any other account executive ever tried to conceal that fact.[2]

Crucially, the Government also failed to present evidence that Ms. Drake was

familiar with the contents of the Harrison 2.0 loan documentation – including the

commercial loan memo, the factoring loan package, and the UCC-1 filings. To have

committed the alleged nominee lending, Ms. Drake needed to understand that

Mr. Harrison was *not* included in that loan documentation. However, the Government

failed to present evidence of that knowledge. For all she knew, Mr. Harrison might have

been the signed guarantor and Mr. Corriher might have filed a UCC-1 notice for CMI and

CMI of Iowa. There was no evidence Ms. Drake knew the significance of such issues,

much less was familiar with the particular loan documentation.

Finally, there is no evidence that Mr. Corriher or anyone talked to Ms. Drake

about any purpose to circumvent the lending limits of GrandSouth Bank. What is more,

there has been no evidence that Ms. Drake even understood that a bank has lending limits

or how they worked – before seeing them explained in the indictment, anyway (*see* Doc.

No. 85 ¶¶ 21 *et seq.*). The evidentiary record gives no reason why Ms. Drake would have

---

[2] Indeed, this appears to have been common knowledge throughout GrandSouth Bank. Mr. Harrison's signature appears front-and-center on the wire request form for the Harrison 2.0 clients, and the operations department even created a recurring wire for these clients entitled "GrandSouth Bank for Greg Harrison."

known anything about that topic, given that none of her work in the factoring department involved the bank's lending limits.[3] Thus, the Government also failed to provide sufficient evidence to prove that Ms. Drake ever intended or conspired to help Mr. Harrison circumvent the lending limits of GrandSouth Bank.

C. **The Alleged Fraud and False Pretenses Were Independent of and Prior to Ms. Drake's Assignment to the Harrison 2.0 Accounts**

In the timeline of events for this trial, Ms. Drake's name comes up for the very first time on January 16, 2009, the day when Mr. Corriher assigned her to work on the Harrison 2.0 clients. According to the evidence, then, Ms. Drake had no involvement with anything related to this case before January 16, 2009. That means she had no involvement of any kind with the following for Harrison 2.0:

- Loan proposals dated July 10, 2008;

- Commercial loan memos on July 25, 2008, and all supporting paperwork;

- Loan package documents signed on July 29, 2008, including the factoring agreements, personal guaranties, and letters allowing Global Labor to request and receive funds under the factoring agreements;

- Recording of loan documents on the bank's books, including the decision not to make them "related to" Mr. Harrison, and creation of associated loan numbers and deposit accounts;

---

[3] To be clear, there is evidence that account executives would check compliance with "credit limits" for debtors based on the limits established by Mr. Corriher in Factor/SQL, but that is something completely different from the concept of a bank's lending limits.

- UCC-1 security notices filed in December 2008, including the decision not to file UCC-1 security notices for CMI and CMI of Iowa;

- Mr. Corriher's creation of the advance sheets and modified wire request form that would be used for the licensee company factoring accounts;

- Mr. Corriher's email on January 2, 2009, telling Ms. Akers to divide up their customer list among this group of factoring client accounts;

- Mr. Corriher's creation of client profiles in Factor/SQL, upload of the lists of divided-up debtors, and establishment of debtor credit limits; and

- Mr. Corriher's upload of initial invoice spreadsheets from Ms. Akers to fund the wire transfer of $3,281,362.30 to US Funding.

Accordingly, the fraud and false pretenses that have been alleged were all executed and set in motion prior to Ms. Drake having any involvement with Harrison 2.0. In particular, the debtors were already divided up among the licensee company clients, and Mr. Corriher already arranged the Factor/SQL, advance sheet, and modified wire request form so that lists of alleged CMI invoices provided by Ms. Akers and her staff would be factored under the licensee company names, and then advances would be sent to Global Labor's bank account. This was the crux of the Government's alleged false pretenses by Ms. Drake, but as the evidence at trial has now made clear, it was all arranged entirely without her.[4]

_____

[4] Indeed, the Government's trial brief makes only one mention of Ms. Drake actually doing something: "Corriher *and Drake* established an elaborate system at the bank by which thousands of payments made out to CMI were applied to the loan accounts in the names of the five nominees. *They* also set up a system whereby the proceeds of the loans

### D. Ms. Drake Merely Did Her Job as Required

The factoring department's procedures provided that, once Mr. Corriher finishes

setting up everything, "[e]ach client account is assigned to an account manager who is

responsible for maintaining the account as approved" (Gov. Ex. 1285). Ms. Drake was

assigned that job for the Harrison 2.0 accounts on January 16, 2009, and thereafter

became obligated to perform the work as directed by Mr. Corriher. The testimony of

Cyndy Ayers summed it up well: "Thank God it wasn't my account or, that I didn't have

to deal with it." The Government's evidence has revealed nothing about Ms. Drake's

conduct or intent beyond what Mr. Corriher stated on cross: "she did her job."

Furthermore, the evidence shows that, when Ms. Drake frequently missed work

because of her migraines, her absence actually made no difference to the Harrison 2.0

factoring. Other account executives, including Lesley Cannon and Blake Timanus,

stepped in to do the same work in the same manner that Mr. Corriher had directed.

Accordingly, Ms. Drake was not essential to the Harrison 2.0 factoring.

Indeed, four out of the twelve wire transfers to Global Labor charged as separate

offenses in Counts 3 to 14 and 16 to 27 were clearly handled by somebody else from the

factoring department other than Ms. Drake:

---

made to the nominees were combined to fund wire transfers to an account controlled by
BGH." (Doc. No. 425 at 10, emphasis added.) Were it to be true, this claim about
Ms. Drake might distinguish her somewhat from Lesley Cannon and the many others
who worked on Harrison 2.0 but were not charged. However, the evidence presented by
the Government has failed to make good on that promise.

| Gov't Ex. | Date | Amount | Counts | Employee Taking Request |
|---|---|---|---|---|
| 1109 | 2/17/2009 | $125,000 | 3 & 16 | Doug Corriher |
| 893 | 3/2/2009 | $130,000 | 4 & 17 | Doug Corriher |
| 1206 | 12/10/2009 | $449,000 | 10 & 23 | Lesley Cannon |
| 1220 | 2/25/2010 | $270,000 | 11 & 24 | Lesley Cannon |

As a whole, the evidence makes clear that Ms. Drake was just another one of the employees in the factoring department whom Mr. Corriher was free to direct as he pleased to handle the administrative side of factoring. There is no evidence that any of these employees, including Ms. Drake, ever intended to falsify records or join a criminal conspiracy by doing such work for the Harrison 2.0 accounts. On this record, "[i]t would require pure conjecture on the part of the jury to find that a conspiracy" to misapply funds or falsify bank records existed for Ms. Drake, "and that she knowingly and voluntarily participated in it." *MacCloskey*, 682 F.2d at 473.

### E. Count 29 Remains a Flawed and Unproven Theory

In Count 29, the Government has charged a separate conspiracy as to Ms. Drake and Robert Taylor. Per the Government's argument, the theory is that GrandSouth Bank applied money obtained from new factoring advances in order to pay off old uncollectible invoices, and that there is something wrong with that. This idea sprang from the mind of Special Agent Donna Hench and is summed up by her demonstrative.

Special Agent Hench's testimony focused on whether it was the same money obtained from factoring advances on April 8, 2009, that was used to pay off "over-90-day" invoices which had piled up because of errors in the transition of the factoring from

8

US Funding to GrandSouth Bank. There are plenty of gaps with her analysis and speculation in the proposed inference of "circular lending." They are detailed in Mr. Taylor's motion to exclude Special Agent Hench's testimony (Doc. No. 437) and associated oral argument, which Ms. Drake also joined.

Separately, however, the Government also makes a basic assumption that it would be fraudulent for a bank's factoring client to pay off uncollectible "over-90-day" invoices with proceeds of factoring advances made on new "under-90-day" invoices. This has been equated by the Government to a bank client obtaining a new loan to pay off another older loan and thereby misrepresent the age of his debt – that is to say, circular lending. However, that basic assumption is unsupported by the evidence and is inconsistent with the terms and conditions of the factoring agreements.

As previously mentioned, there is no evidence that Ms. Drake herself was familiar with the contents of the factoring agreements in this case, much less the nuances of their terms and conditions. Nonetheless it is important to bear them in mind for purposes of assessing the Government's theory to support Count 29 (*see, e.g.*, Gov. Ex. 619):

- "Seller" refers to the factoring client, "Purchaser" refers to the bank, "Account" refers in general to a Seller's invoice or account receivable.

- Section 2.1.2 provides that "Seller shall sell to Purchaser … such of Seller's Accounts as are listed from time to time on Accounts Transmittal," meaning the spreadsheet of invoices to be factored, for their "Face Amount" minus 15% thereof and any applicable fees.

9

- "Purchased Account" refers to an Account that has been factored, and "Late Payment Date" means "90 … days from the date on which a Purchased Account was created" – that is, when it was factored by the bank.

- Section 4.1.3 provides that "Purchaser may require that Seller repurchase, by payment of the unpaid Face Amount thereof together with any unpaid fees relating to the Purchased Account on demand, or, at Purchaser's option, by Purchaser's charge to the Reserve Account: … any Purchased Account which remains unpaid beyond the Late Payment Date."

Accordingly, the terms of the factoring agreement specifically provide that GrandSouth Bank may require a factoring client to buy out "over-90-day" invoices by paying the amount of money owed by the debtor. Thus, there is nothing fraudulent or even unusual about GrandSouth Bank requiring a factoring client to pay off invoices that became uncollectible. The only remaining issue for the Government's theory would be whether the client may do this using funds that it obtained from factoring advances based on newer receivables. This approach might seem a little unusual, but there is no reason why it must be fraudulent.[5] The new funds were obtained by factoring a different group of newer receivables which are still collectible – not the same group of older invoices that are considered uncollectible. Thus, it is not "circular lending" as alleged.

---

[5] Presumably, Mr. Harrison simultaneously recouped the money from US Funding, since they had caused the issue by failing to forward debtor payments to GrandSouth Bank. The Government has failed to explain either way, but its flawed theory of circular lending would not result in Mr. Harrison getting any more money.

10

WHEREFORE, for the reasons discussed above and at any hearing on this motion, this Court should enter a judgment of acquittal on all counts as to Ms. Drake.

Respectfully submitted this the 28th day of January, 2019.

/s/ Claire J. Rauscher
Claire J. Rauscher, N.C. Bar No. 21500
Allen T. O'Rourke, N.C. Bar No. 38404
Womble Bond Dickinson (US) LLP
301 S. College Street, Ste. 3500
Charlotte, NC 28202
Telephone: (704) 331-4900
Fax: (704) 338-7811
claire.rauscher@wbd-us.com
allen.orourke@wbd-us.com

*Counsel for Defendant Shannon Drake*

11

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 28th day of January, 2019, a copy of the foregoing Motion for Judgment of Acquittal was filed with the Clerk of Court using the CM/ECF System, which will send notification of such filing to the following:

Matthew Martin
United States Attorney
Frank Joseph Chut, Jr.
Assistant United States Attorney
101 S. Edgeworth Street, 4th Floor
Greensboro, NC 27401
Matt.Martin@usdoj.gov
Frank.Chut@usdoj.gov
*Counsel for Plaintiff USA*

Wes J. Camden
Caitlin M. Poe
Ward and Smith, P.A.
POB 33009
Raleigh, NC 27636-3009
Wjcamden@wardandsmith.com
Cmpoe@wardandsmith.com
*Counsel for Defendant Robert Thomas Taylor*

William M. Montague
US Department of Justice
601 D St., NW, 7th Floor
Washington, DC 20004
William.Montague@usdoj.gov
*Counsel for Plaintiff USA*

James W. Bannister
Bannister, Wyatt & Stalvey, LLC
Post Office Box 10007
Greenville, SC 29603
Jbannister@bannisterwyatt.com
*Counsel for Defendant Robert Thomas Taylor*

Jeffrey A. McLellan
US Department of Justice
Trial Attorney, Tax Division
POB 972
Washington, DC 20044
Jeffrey.A.Mclellan@usdoj.gov
*Counsel for Plaintiff USA*

Joshua Brian Howard
Gammon, Howard & Zeszotarski, PLLC
115 ½ W. Morgan Street
Raleigh, NC 27601
Jhoward@ghz-law.com
*Counsel for Defendant Ronald Keith Earnest*

Sandra J. Hairston
US Attorney's Office
101 S. Edgeworth Street, 4th Floor
Greensboro, NC 27401
Sandra.Hairston@usdoj.gov
*Counsel for Plaintiff USA*

Deborah B. Barbier
Deborah B. Barbier, LLC
1811 Pickens Street
Columbia, SC 29201
dbb@deborahbarbier.com
*Counsel for Defendant Ronald Keith Earnest*

 /s/ Claire J. Rauscher

Claire J. Rauscher
*Counsel for Shannon M. Drake*

**CERTIFICATION OF WORD COUNT**

**I hereby certify the word count is 2758 words.**

Claire J. Rauscher
*Counsel for Shannon M. Drake*